# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| DANA RAVIZEE; ELYSSA SCHNEIDER; PRESTON LIPE; JESSICA LIU; JEFF KLEE; MIKE ARGERSINGER; JUNO DINA; LISA MELEGARI; DAVID FREIFELD; MICHAEL FEELER; DONNA JOHNSTON; DANIEL BROWN; COLLEEN REDDING; MELODY LOMBARDO; CHERYL WALLACE; CARA ZAJAC; STEVEN JOSEPHSON; JAMES ANDERSON; JOHN KUBALA; MARCELLE SPRINGER; WANDA DURYEA; SARA SCOWDEN; TIMOTHY BROWN; SUSAN DOMBROSKE; VANESSA MCCAFFERY; JUSTINE SHAMEY; SHANNON WEST; ANDREW FLOOD; MICHAEL DIBIASIO; CHRISTINE HALL; JOHN CABE; KERRI PARKER; NICK HADSEL-MARES; JARED COLLINS; ALICE HOLM, | Case No. _____ <br><br> **CLASS ACTION COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |
| Plaintiffs, | |
| v. | |
| MCCAIN FOODS USA, INC.; MCCAIN FOODS LIMITED; LAMB WESTON HOLDINGS, INC.; LAMB WESTON, INC.; LAMB WESTON BSW, LLC; LAMB WESTON/MIDWEST, INC.; LAMB WESTON SALES, INC.; J.R. SIMPLOT CO.; CAVENDISH FARMS LTD; CAVENDISH FARMS, INC.; NATIONAL POTATO PROMOTION BOARD, D/B/A POTATOES USA; CIRCANA, LLC, | |
| Defendants. | |

**TABLE OF CONTENTS**

Page

I. INTRODUCTION ......................................................................................... 1

II. JURISDICTION AND VENUE ................................................................... 5

III. PARTIES ...................................................................................................... 7

    A. PLAINTIFFS ................................................................................... 7

    B. DEFENDANTS ............................................................................. 13

        1. LAMB WESTON ............................................................... 13

        2. MCCAIN ........................................................................... 14

        3. J.R. SIMPLOT ................................................................... 14

        4. CAVENDISH FARMS ....................................................... 15

        5. CIRCANA .......................................................................... 15

        6. NPPB ................................................................................. 17

IV. AGENTS AND CO-CONSPIRATORS ..................................................... 17

V. FACTUAL ALLEGATIONS ...................................................................... 18

    A. THE FROZEN POTATO PRODUCTS MARKET ......................... 18

    B. DEFENDANTS REPEATEDLY COORDINATED NEARLY IDENTICAL PRICE HIKES OF FROZEN POTATO PRODUCTS DURING THE CLASS PERIOD. ....................................................... 20

        1. A SELECT GROUP OF DEFENDANT PROCESSORS' SENIOR EXECUTIVES SET PRICES FOR FROZEN POTATO PRODUCTS ACROSS FOODSERVICE AND RETAIL. ............................................................................. 20

        2. PRICES FOR FROZEN POTATO PRODUCTS ROSE DRAMATICALLY BECAUSE OF DEFENDANTS' COLLUSION. ...................................................................... 21

        3. DEFENDANTS' EXCHANGE OF COMPETITIVELY SENSITIVE DATA AND CLOSE-KNIT RELATIONSHIPS ENABLED PRICE COORDINATION. ................. 24

        4. DEFENDANTS IMPOSED LOCKSTEP PRICE INCREASES. ...................................................................... 27

        5. DEFENDANTS EMPLOYED VARIOUS METHODS TO ENSURE COMPLIANCE WITH THE CONSPIRACY. ....................... 33

C.     THE FROZEN POTATO PRODUCT INDUSTRY HAS
       FEATURES THAT MAKE IT SUSCEPTIBLE TO COLLUSION. ................ 34

       1.     THE FROZEN POTATO INDUSTRY IS HIGHLY
              CONCENTRATED. ........................................................................ 35

       2.     BARRIERS TO MARKET ENTRY ARE HIGH. ............................... 35

       3.     FROZEN POTATO PRODUCTS HAVE LOW DEMAND
              ELASTICITY. ........................................................................... 36

       4.     FROZEN POTATO PRODUCTS DO NOT HAVE
              CLOSE SUBSTITUTES. .................................................................. 37

       5.     FROZEN POTATO PRODUCTS ARE RELATIVELY
              HOMOGENEOUS COMMODITIES. .................................................. 37

       6.     DEFENDANTS' EXECUTIVES HAVE SOCIAL AND
              BUSINESS RELATIONSHIPS. ......................................................... 38

D.     MARKET POWER OF DEFENDANT PROCESSORS ................................... 40

VI.    INTERSTATE TRADE AND COMMERCE ............................................... 41

VII.   ANTITRUST INJURY ................................................................................ 42

VIII.  TOLLING OF THE STATUTES OF LIMITATIONS .................................. 43

IX.    DEFENDANTS ARE NOT IMMUNE ........................................................ 44

X.     CLASS ACTION ALLEGATIONS .............................................................. 46

XI.    CLAIMS FOR RELIEF ............................................................................. 50

COUNT ONE  VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3
       RESTRAINT OF TRADE (ON BEHALF OF NATIONWIDE CLASS
       FOR INJUNCTIVE AND EQUITABLE RELIEF) ........................................ 50

COUNT TWO  VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3
       CONSPIRACY TO EXCHANGE COMPETITIVELY SENSITIVE
       INFORMATION (ON BEHALF OF NATIONWIDE CLASS FOR
       INJUNCTIVE AND EQUITABLE RELIEF) ................................................. 52

VIOLATIONS OF STATE LAW ............................................................................ 53

COUNT THREE  VIOLATION OF ALABAMA'S ANTITRUST ACT,  ALA.
       CODE §§ 6-5-60, ET SEQ. (WITH RESPECT TO CLASS MEMBERS'
       PURCHASES IN ALABAMA) ................................................................... 54

COUNT FOUR  VIOLATION OF THE ARIZONA UNIFORM STATE
       ANTITRUST ACT,  ARIZ. REV. STAT. §§ 44-1401, ET SEQ. (WITH
       RESPECT TO CLASS MEMBERS' PURCHASES IN ARIZONA) ............................ 54

COUNT FIVE  VIOLATION OF ARKANSAS DECEPTIVE TRADE
    PRACTICES ACT,  ARK. CODE ANN. §§ 4-88-101, ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN ARKANSAS) ........................ 55

COUNT SIX  VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,  CAL.
    BUS. & PROF. CODE § 16700, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN CALIFORNIA) ............................................................. 55

COUNT SEVEN  VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION
    LAW,  CAL. BUS. & PROF. CODE § 17200, ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN CALIFORNIA) ..................... 56

COUNT EIGHT  VIOLATION OF COLORADO'S ANTITRUST ACT,  COL.
    REV. STAT. § 6-4-104, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN COLORADO) .............................................................. 57

COUNT NINE  VIOLATION OF CONNECTICUT'S ANTITRUST ACT,
    CONN. GEN. STAT. § 35-24, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN CONNECTICUT) ......................................................... 57

COUNT TEN  VIOLATION OF THE DISTRICT OF COLUMBIA
    ANTITRUST ACT,  D.C. CODE § 28-4501, ET SEQ. (WITH RESPECT
    TO CLASS MEMBERS' PURCHASES IN THE DISTRICT OF
    COLUMBIA) ................................................................................................................... 58

COUNT ELEVEN  VIOLATION OF THE FLORIDA DECEPTIVE AND
    UNFAIR TRADE PRACTICES ACT,  FLA. STAT. § 501.201, ET SEQ.
    (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
    FLORIDA) ...................................................................................................................... 58

COUNT TWELVE  VIOLATION OF THE HAWAII ANTITRUST STATUTE,
    HAW. REV. STAT. § 480-1, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN HAWAII) ................................................................... 59

COUNT THIRTEEN  VIOLATION OF THE ILLINOIS ANTITRUST ACT,
    740 ILL. COMP. STAT. 10/1, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN ILLINOIS) ................................................................. 59

COUNT FOURTEEN  VIOLATION OF THE IOWA COMPETITION LAW,
    IOWA CODE §§ 553.1, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN IOWA) ........................................................................ 60

COUNT FIFTEEN  VIOLATION OF THE KANSAS RESTRAINT OF TRADE
    ACT,  KAN. STAT. ANN. §§ 50-101, ET SEQ. (WITH RESPECT TO
    CLASS MEMBERS' PURCHASES IN KANSAS) ...................................................... 60

COUNT SIXTEEN  VIOLATION OF MAINE'S MONOPOLIES AND
    PROFITEERING LAW,  ME. REV. STAT. ANN. TIT. 10, §§ 1101, ET
    SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
    MAINE) ........................................................................................................................... 61

COUNT SEVENTEEN  VIOLATION OF THE MARYLAND ANTITRUST
    ACT,  MD. CODE COM. LAW § 11-204, ET SEQ. (WITH RESPECT
    TO CLASS MEMBERS' PURCHASES IN MARYLAND) ......................................... 61

COUNT EIGHTEEN  VIOLATION OF THE MASSACHUSETTS CONSUMER
PROTECTION ACT,  MASS. GEN. LAWS. CH. 93A § 1, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
MASSACHUSETTS) ................................................................................. 62

COUNT NINETEEN  VIOLATION OF THE MICHIGAN ANTITRUST
REFORM ACT,  MICH. COMP. LAWS ANN. §§ 445.771, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
MICHIGAN) ............................................................................................ 62

COUNT TWENTY  VIOLATION OF THE MINNESOTA ANTITRUST LAW,
MINN. STAT. ANN. §§ 325D.49, ET SEQ. (WITH RESPECT TO
CLASS MEMBERS' PURCHASES IN MINNESOTA) ................................. 63

COUNT TWENTY-ONE  VIOLATION OF THE MISSISSIPPI ANTITRUST
STATUTE,  MISS. CODE ANN. §§ 75-21-3, ET SEQ. (WITH RESPECT
TO CLASS MEMBERS' PURCHASES IN MISSISSIPPI) ........................... 63

COUNT TWENTY-TWO  VIOLATION OF THE MONTANA CONSUMER
PROTECTION ACT,  MONT. CODE ANN. §§ 30-14-101, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
MONTANA) ............................................................................................ 64

COUNT TWENTY-THREE  VIOLATION OF THE NEBRASKA JUNKIN
ACT,  NEB. CODE ANN. §§ 59-801, ET SEQ. (WITH RESPECT TO
CLASS MEMBERS' PURCHASES IN NEBRASKA) ................................... 64

COUNT TWENTY-FOUR  VIOLATION OF THE NEVADA UNFAIR TRADE
PRACTICES ACT,  NEV. REV. STAT. ANN. §§ 598A.010, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN
NEVADA) ............................................................................................... 65

COUNT TWENTY-FIVE  VIOLATION OF THE NEW HAMPSHIRE
ANTITRUST STATUTE,  N.H. REV STAT. ANN. §§ 356.1, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW
HAMPSHIRE) ......................................................................................... 65

COUNT TWENTY-SIX  VIOLATION OF THE NEW JERSEY ANTITRUST
ACT,  N.J. STAT. ANN. § 56:9-3, ET SEQ.  (WITH RESPECT TO
CLASS MEMBERS' PURCHASES IN NEW JERSEY) ............................... 66

COUNT TWENTY-SEVEN  VIOLATION OF THE NEW MEXICO
ANTITRUST ACT,  N.M. STAT. ANN. §§ 57-1-1, ET SEQ.  (WITH
RESPECT TO CLASS MEMBERS' PURCHASES IN NEW MEXICO) .................... 66

COUNT TWENTY-EIGHT  VIOLATION OF THE NEW YORK DONNELLY
ACT,  N.Y. GEN. BUS. LAW §§ 340, ET SEQ. (WITH RESPECT TO
CLASS MEMBERS' PURCHASES IN NEW YORK) ................................... 67

COUNT TWENTY-NINE  VIOLATION OF CHAPTER 75 OF NORTH
CAROLINA'S GENERAL STATUTES,  N.C. GEN. STAT. ANN. §§ 75-
1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES
IN NORTH CAROLINA) ........................................................................... 67

COUNT THIRTY  VIOLATION OF THE NORTH DAKOTA UNIFORM
    STATE ANTITRUST ACT,  N.D. CENT. CODE §§ 51-08.1-01, ET SEQ.
    (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH
    DAKOTA) ....................................................................................................... 68

COUNT THIRTY-ONE  VIOLATION OF THE OREGON ANTITRUST ACT,
    OR. REV. STAT. §§ 646.705, ET SEQ. (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN OREGON) .................................................... 68

COUNT THIRTY-TWO  VIOLATION OF PUERTO RICO ANTIMONOPOLY
    LAW,  P.R. LAWS ANN. TIT. 10, CH. 13, § 257 ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN PUERTO RICO) ..................... 69

COUNT THIRTY-THREE  VIOLATION OF THE RHODE ISLAND
    ANTITRUST ACT,  R.I. GEN. LAWS §§ 6-36-1, ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN RHODE ISLAND) ................. 69

COUNT THIRTY-FOUR  VIOLATION OF THE SOUTH DAKOTA
    ANTITRUST STATUTE,  S.D. CODIFIED LAWS §§ 37-1-3.1, ET SEQ.
    (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN SOUTH
    DAKOTA) ....................................................................................................... 70

COUNT THIRTY-FIVE  VIOLATION OF TENNESSEE'S TRADE
    PRACTICES ACT,  TENN. CODE ANN. §§ 47-25-101, ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN TENNESSEE) ....................... 70

COUNT THIRTY-SIX  VIOLATION OF THE UTAH ANTITRUST ACT,
    UTAH CODE ANN. §§ 76-10-3101, ET SEQ. (WITH RESPECT TO
    CLASS MEMBERS' PURCHASES IN UTAH) ............................................... 71

COUNT THIRTY-SEVEN  VIOLATION OF THE VERMONT CONSUMER
    FRAUD ACT,  VT. STAT. ANN. TIT. 9, §§ 2451, ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN VERMONT) ......................... 71

COUNT THIRTY-EIGHT  VIOLATION OF THE WEST VIRGINIA
    ANTITRUST ACT,  W.VA. CODE §§ 47-18-1, ET SEQ. (WITH
    RESPECT TO CLASS MEMBERS' PURCHASES IN WEST
    VIRGINIA) ...................................................................................................... 72

COUNT THIRTY-NINE  VIOLATION OF THE WISCONSIN ANTITRUST
    ACT,  WIS. STAT. §§ 133.01, ET SEQ.  (WITH RESPECT TO CLASS
    MEMBERS' PURCHASES IN WISCONSIN) ................................................ 72

PRAYER FOR RELIEF ................................................................................ 73

JURY TRIAL DEMANDED ......................................................................... 75

Plaintiffs Dana Ravizee, Elyssa Schneider, Preston Lipe, Jessica Liu, Jeff Klee, Mike Argersinger, Juno Dina, Lisa Melegari, David Freifeld, Michael Feeler, Donna Johnston, Daniel Brown, Colleen Redding, Melody Lombardo, Cheryl Wallace, Cara Zajac, Steven Josephson, James Anderson, John Kubala, Marcelle Springer, Wanda Duryea, Sara Scowden, Timothy Brown, Susan Dombroske, Vanessa McCaffery, Justine Shamey, Shannon West, Andrew Flood, Michael DiBiasio, Christine Hall, John Cabe, Kerri Parker, Nick Hadsel-Mares, Jared Collins, and Alice Holm (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, bring this Class Action Complaint for damages and injunctive relief against Defendants McCain Foods Limited and McCain Foods USA, Inc., ("McCain"); Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. ("Lamb Weston"); J.R. Simplot Co. ("J.R. Simplot"); Cavendish Farms Ltd. and Cavendish Farms, Inc. ("Cavendish Farms"); National Potato Promotion Board d/b/a Potatoes USA ("NPPB"); and Circana, LLC ("Circana") (collectively, "Defendants"). Plaintiffs bring this action for injunctive relief under Sections 1 and 3 of the Sherman Act, and for treble damages under the antitrust laws, unfair competition laws, and consumer protection laws of numerous jurisdictions against Defendants. Plaintiffs demand a trial by jury.

## I.     INTRODUCTION

1.     Four companies—McCain, Lamb Weston, J.R. Simplot, and Cavendish Farms—dominate the market for frozen french fries, hash browns, tater tots, and other frozen potato products ("Frozen Potato Products"). Those four producers, referred to herein as the "Defendant Processors," account for nearly 98% of the $68 billion annual market for Frozen Potato Products in the United States. Within these companies, only a handful of individuals are tasked with setting (and adjusting) the prices for Frozen Potato Products.

2.    These four Defendant Processors—and the limited universe of executives and senior managers with price-setting authority at each—further benefit from their leadership in trade associations like the National Potato Promotion Board. NPPB offered regular opportunities for in-person meetings and conversations between Defendants' executives, many of whom served on the NPPB's board. In addition, a third-party data analytics company, Circana, offered detailed data analytics through various programs like "PotatoTrack" and "IRI." These platforms offered clients—including all four Defendant Processors—in-depth reports on the market for Frozen Potato Products. These reports provided Defendant Processors unique insights into one another's pricing strategies, output, product lines, and even market share.

3.    In recent years, Defendants discovered their ability to leverage their dominance in this market, as well as their regular contacts and access to one another's competitively sensitive data, to fix the prices of Frozen Potato Products at artificially inflated levels. Defendants' well-orchestrated conspiracy, and the small number of entities involved, enabled them to coordinate price hikes with unusual effectiveness.

4.    In one remarkable five-day stretch in February 2022, for example, ***all four Defendant Processors*** announced nearly identical price hikes of roughly 12 cents per pound on Frozen Potato Products. In April 2022, Defendant Processors announced another set of uniform price increases, prompting one Washington, D.C. restaurant owner to remark, "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount. Totally not collusion or anything, right?"

5.    These increases did not just impact restaurants, however. Multiple industry insiders confirmed that Defendant Processors' price increases impacted both their foodservice (*e.g.*, restaurants) and retail (*e.g.*, grocery stores) distribution channels. Industry insiders reported that price increases always (or nearly always) impacted both distribution channels.

6.      Nor were these the only coordinated price hikes of this kind. On at least four other occasions—in January 2021, February 2021, May and June 2021, and October 2021—Defendant Processors issued substantially identical price hikes on Frozen Potato Products at nearly exactly the same time. Although the industry had seen price increases before, this "wasn't typical or historically how price increases" occurred, according to one witness. "It was very suspect."

7.      Defendants were not subtle about the motivations behind these coordinated price hikes. In 2023, the Director of Sales Solutions for J.R. Simplot explained that Defendants were "push[ing] pricing" rather than "going after new business." The former VP of International at Lamb Weston explained that Defendants "absolutely" have "no incentive to fight that hard for each other's share." Rather than compete for market share, Defendants were content to "behav[e] themselves."

8.      As a result, according to the Director of Sales Solutions at J.R. Simplot, when some customers threatened to switch to a competitor after the company increased its prices, J.R. Simplot responded with confident indifference: "[W]e weren't worried about it." That confidence was well-founded. When a Senior Director for McCain Foods indicated interest in competing with Lamb Weston on the price of battered fries in order to pursue increased market share, "the higher ups in the room" advised against the idea because they didn't want "to screw it up for everyone."

9.      Rather than compete on price, Defendant Processors were careful to ensure that any price increases were matched by their ostensible competitors. Although certain lower-level witnesses expressed confusion at how those at their company knew their competitors' prices, Plaintiffs' investigation has revealed at least some of the myriad ways in which Defendants shared this information with each other. Employees and executives in the close-knit industry would often share pricing information directly, including between employees of one Defendant Processor who had previously worked for another Defendant Processor. Defendant Processors also ensured that

their price increase letters were readily available to one another. When a sales and marketing manager suggested altering the manner in which her employer communicated price increase letters (to prevent recipients from forwarding them onto others), her supervisors quickly rejected the idea. They did not want to interfere with their competitor's access to her employer's pricing information.

10.     All of this occurred even as the input costs for Frozen Food Products *declined* dramatically. As one of Defendant Processors' former employees explained, "costs have come down. Pricing hasn't. Now there is excess capacity. Prices should be coming down." To date, however, prices for Frozen Potato Products remain at historic highs.

11.     This combination of coordinated price hikes and declining costs led to unprecedented profit margins, as demonstrated by the following graph, which compares the price of Frozen Potato Products to the price of raw potatoes, the source of approximately 65% of the cost of producing Frozen Potato Products.



12.     Industry observers assumed this level of profitability would be short-lived. Two stock analysts, for example, predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not "be durable longer term." These assumptions, however, were based on a

competitive market, and those assumptions proved unfounded in an industry where ostensible competitors focus on "behaving themselves" rather than "going after business." A former executive at a Defendant Processor, in fact, readily acknowledged that the company was content to simply expand margins through price increases.

13. The results were startling. As that same executive acknowledged, Lamb Weston, J.R. Simplot, and McCain "have never ever seen margins this high in the history of the potato industry." Defendants secured those margins through their multi-faceted conspiracy to fix the prices of Frozen Potato Products.

14. Plaintiffs bring this proposed class action on behalf of indirect purchasers of Frozen Potato Products—individual consumers who purchased everyday products like frozen french fries, tater tots, and hash browns for their own personal consumption. Plaintiffs seek equitable and monetary relief, and to restore competition in the marketplace.

## II. JURISDICTION AND VENUE

15. Plaintiffs bring this antitrust class action lawsuit under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and various state antitrust and consumer protection laws. Plaintiffs' federal claims seek equitable relief, costs, and reasonable attorneys' fees for the injuries sustained by Plaintiffs and the Classes, while Plaintiffs' state-law claims seek injunctive relief, damages, costs, and reasonable attorneys' fees for the same.

16. The Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332(d), 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26. The Court has jurisdiction over Plaintiffs' claim for injunctive relief pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26. The Court has supplemental jurisdiction over Plaintiffs' state-law claims because the claims arise from the same facts as Plaintiffs' federal claims and form part of the same case or controversy as those claims, 28 U.S.C. § 1367.

17.     The Court has personal jurisdiction over Defendants because they purposefully directed their business activity toward, and had substantial contacts with, this jurisdiction. Defendants purposefully placed price-fixed Frozen Potato Products into the stream of commerce throughout the United States, including in this District. Defendants purposefully availed themselves of this state's laws and protections. Plaintiffs' claims for relief arises from and relates to illegal acts committed by Defendants within this jurisdiction because, within this jurisdiction, Plaintiffs paid unlawfully inflated prices for Frozen Potato Products and thereby suffered antitrust injury. The Court also has jurisdiction based on Defendants' minimum contacts with the United States as a whole.

18.     The Court also has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permit antitrust lawsuits against a corporation in any district where the corporation may be found or transacts business and allow process in such cases to be served in any district where the corporation may be found.

19.     Venue is proper in this district under 28 U.S.C. §§ 1391(a), (b), (c), and (d), and 15 U.S.C. §§ 15(a) and 22. During the Class Period (defined below), Defendants transacted business in this District, and a substantial portion of the activity at issue in this case occurred in this District. Additionally, Defendant McCain Foods USA, Inc., has its corporate headquarters and principal place of business in Oak Brook, Illinois, within the Northern District of Illinois.

20.     Defendants' conduct allegedly occurred within the flow of interstate commerce, including in this District, and was intended to and did have a direct and substantial effect upon such commerce.

21.     During the Class Period, Defendants processed and sold Frozen Potato Products in a continuous and uninterrupted flow of interstate commerce, which included the processing and sale of Frozen Potato Products, media advertisement of Frozen Potato Products, and employment

of sales personnel—all in this District. Defendants' conduct had and continues to have a direct, substantial, and reasonably foreseeable effect on interstate commerce, including commerce within this District.

22.     No other forum would be more convenient for the parties and witnesses to litigate this case.

### III.     PARTIES

**A.     PLAINTIFFS**

23.     Plaintiff Dana Ravizee is an Alabama resident residing in Greene County where she purchased Frozen Potato Products, including frozen tater tots and french fries, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

24.     Plaintiff Elyssa Schneider is an Arizona resident residing in Maricopa County where she purchased Frozen Potato Products, including frozen tater tots and french fries, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

25.     Plaintiff Preston Lipe is an Arkansas resident residing in Benton County where he purchased Frozen Potato Products, including frozen tater tots and curly fries, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

26.     Plaintiff Jessica Liu is a California resident residing in Contra Costa County where she purchased Frozen Potato Products, including frozen tater tots and french fries, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

27.     Plaintiff Jeff Klee is a California resident residing in Fresno County where he purchased Frozen Potato Products, including frozen tater tots and frozen french fries, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

28.     Plaintiff Mike Argersinger is a Colorado resident residing in Jefferson County where he purchased Frozen Potato Products, including frozen tater tots and frozen hash browns, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

29.     Plaintiff Juno Dina is a Connecticut resident residing in New Haven County where she purchased Frozen Potato Products, including frozen french fries, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

30.     Plaintiff Lisa Melegari is a Florida resident residing in Volusia County where she purchased Frozen Potato Products, including frozen tater tots and frozen hash browns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

31.     Plaintiff David Freifeld is an Illinois resident residing in Lake County where he purchased Frozen Potato Products for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

32.     Plaintiff Michael Feeler is an Illinois resident residing in Moultrie County where he purchased Frozen Potato Products, including frozen tater tots, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

33.     Plaintiff Donna Johnston is an Iowa resident residing in Woodbury County where she purchased Frozen Potato Products, including frozen french fries, frozen tater tots, and frozen

hash browns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

34.     Plaintiff Daniel Brown is a Kansas resident residing in Montgomery County where he purchased Frozen Potato Products, including frozen tater tots, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

35.     Plaintiff Colleen Redding is a Maine resident residing in Waldo County where she purchased Frozen Potato Products, including frozen french fries, frozen tater tots, and frozen hash browns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

36.     Plaintiff Melody Lombardo is a Maryland resident residing in Baltimore County where she purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

37.     Plaintiff Cheryl Wallace is a Massachusetts resident residing in Middlesex County where she purchased Frozen Potato Products, including frozen french fries, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

38.     Plaintiff Cara Zajac is a Massachusetts resident residing in New Bedford County where she purchased Frozen Potato Products, including frozen french fries, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

39.     Plaintiff Steven Josephson is a Michigan resident residing in Wayne County where he purchased Frozen Potato Products, including frozen french fries and frozen potato puffs, for his

personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

40. Plaintiff James Anderson is a Minnesota resident residing in Ramsey County where he purchased Frozen Potato Products, including frozen french fries, frozen tater tots, and frozen hashbrowns, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

41. Plaintiff John Kubala is a Mississippi resident residing in Rankin County where he purchased Frozen Potato Products, including frozen french fries and frozen hashbrowns, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

42. Plaintiff Marcelle Springer is a Nevada resident residing in Clark County where she purchased Frozen Potato Products, including frozen hashbrowns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

43. Plaintiff Wanda Duryea is a New Hampshire resident residing in Strafford County where she purchased Frozen Potato Products, including frozen french fries and frozen hashbrowns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

44. Plaintiff Sara Scowden currently resides in Arkansas, but resided in Bernalillo County, New Mexico until December 2024. While she resided in New Mexico, she purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

45. Plaintiff Timothy Brown is a New Jersey resident residing in Bergen County where he purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for his

personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

46.     Plaintiff Susan Dombroske is a New York resident residing in Onondaga County where she purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

47.     Plaintiff Vanessa McCaffery is a New York resident residing in Tompkins County where she purchased Frozen Potato Products, including frozen hashbrowns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

48.     Plaintiff Justine Shamey is a North Carolina resident residing in Forsyth County where she purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

49.     Plaintiff Shannon West is a North Carolina resident residing in Forsyth County where she purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

50.     Plaintiff Andrew Flood is an Oregon resident residing in Multnomah County where he purchased Frozen Potato Products for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

51.     Plaintiff Michael DiBiasio is a Rhode Island resident residing in Providence County where he purchased Frozen Potato Products, including frozen french fries and frozen tater tots, for

his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

52.     Plaintiff Christine Hall is a South Carolina resident residing in York County where she purchased Frozen Potato Products, including frozen french fries, frozen tater tots, and frozen hashbrowns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

53.     Plaintiff John Cabe is a Tennessee resident residing in Knox County where he purchased Frozen Potato Products for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

54.     Plaintiff Kerri Parker is a Utah resident residing in Weber County where she purchased Frozen Potato Products, including frozen french fries, frozen tater tots, and frozen hashbrowns, for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

55.     Plaintiff Nick Hadsel-Mares is a Vermont resident residing in Chittenden County where he purchased Frozen Potato Products for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

56.     Plaintiff Jared Collins is a West Virginia resident residing in Cabell County where he purchased Frozen Potato Products, including frozen french fries and frozen hashbrowns, for his personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

57.     Plaintiff Alice Holm is a Wisconsin resident residing in Kenosha County where she purchased Frozen Potato Products for her personal use during the Class Period and suffered antitrust injury because of the violations alleged in this Complaint.

## B.     DEFENDANTS

### 1.     Lamb Weston

58.     Defendant Lamb Weston Holdings, Inc. is a publicly traded Delaware corporation headquartered in Eagle, Idaho. Lamb Weston Holdings, Inc. began as part of Conagra Brands, Inc., which spun off Lamb Weston Holdings, Inc. in 2016 to Conagra shareholders.

59.     Lamb Weston Holdings, Inc. owns and operates several United States subsidiaries, including Lamb Weston, Inc. (a Delaware corporation), Lamb Weston BSW, LLC (a Delaware LLC), Lamb Weston/Midwest, Inc. (a Washington corporation), and Lamb Weston Sales, Inc. (a Delaware corporation). The consolidated financial statements of Lamb Weston Holdings, Inc., indicate that Lamb Weston Holdings, Inc. wholly owns and controls these subsidiaries and operates them as a unitary enterprise. Lamb Weston's publicity for product purchasers and investments refers to "Lamb Weston" or "Lamb Weston Holdings, Inc." On information and belief, Lamb Weston Holdings, Inc., conducts its Frozen Potato Products business in the United States through the subsidiaries identified above, including by manufacturing, pricing, and selling Frozen Potato Products in the United States.  Below, this complaint refers to Lamb Weston Holdings, Inc., Lamb Weston, Inc., Lamb Weston BSW, LLC, Lamb Weston/Midwest, Inc., and Lamb Weston Sales, Inc. collectively as "Lamb Weston."

60.     In North America, Lamb Weston sells Frozen Potato Products through both the foodservice and retail distribution channels. Lamb Weston sells Frozen Potato Products under the Lamb Weston brand as well as under its owned or licensed brands, the brand names of North American restaurants, customer labels, and retailers' own brands (i.e., "private label" products).

61.     Lamb Weston had $4.2 billion in sales in North America in fiscal year 2023. Lamb Weston operates 27 production facilities and sources its products under "co-packing" agreements, a common practice in the industry wherein manufacturing is outsourced to other companies.

### 2. McCain

62.     Defendant McCain Foods Limited is a corporation organized under the laws of New Brunswick, Canada, with its corporate headquarters in Toronto, Canada. The corporation operates on 47 sites on six continents. It owns United States patents and over 50 United States trademarks.[1]

63.     McCain Foods Limited is a privately owned company with global revenues of more than $14 billion Canadian dollars. One of the world's largest manufacturers of french fry and potato products, McCain Foods boasts that one in four "fries in the world is a McCain Foods fry."

64.     McCain Foods Limited operates in the United States through its subsidiary, McCain Foods USA, Inc. McCain Foods USA, Inc. is incorporated in Maine and has its corporate headquarters and principal place of business at One Tower Lane, 11th Floor, Oakbrook Terrace, Illinois, within the Northern District of Illinois. According to the Illinois Secretary of State, CT Corporation System's office in Chicago, Illinois is McCain Foods USA, Inc.'s registered agent in Illinois. McCain Foods USA, Inc. provides frozen potato and other snack foods "primarily for foodservice customers, retail grocers and private label brands in restaurants and supermarket freezers nationwide" in the United States. It has approximately 4,000 employees in its factories in Maine, Idaho, Nebraska, Washington, and Wisconsin.

65.     McCain Foods Limited and McCain Foods USA, Inc., are collectively referred to as "McCain."

### 3. J.R. Simplot

66.     J.R. Simplot Company is a Nevada Corporation with its headquarters in Boise, Idaho. It is a privately owned company with over 13,000 employees worldwide and claims to be

---

[1] *McCain Foods Limited Trademarks*, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/index.html; McCain Foods Limited Trademarks, Justia Trademarks, https://trademarks.justia.com/owners/mccain-foods-limited-116080/page2.

one of the world's largest french fry producers. J.R. Simplot sells Frozen Potato Products in this District, throughout the State of Illinois, and elsewhere in the United States. J.R. Simplot has admitted in other litigation that it sells products in this District and has conceded that this District may exercise personal jurisdiction and venue over J.R. Simplot. Its 2023 revenue was $9.8 billion.

### 4. Cavendish Farms

67.     Cavendish Farms Ltd. is a part of the J.D. Irving Group of Companies, which has its headquarters in Dieppe, New Brunswick, Canada. Cavendish Farms is North America's fourth largest processor of Frozen Potato Products. Cavendish Farms Ltd. operates four potato processing plants, including one in Jamestown, North Dakota, and sells Frozen Potato Products in the United States.

68.     Cavendish Farms, Inc., is a Delaware corporation with its principal place of business in North Dakota. It is the United States-based subsidiary of Cavendish Farms Ltd.

69.     Cavendish Farms Ltd. and Cavendish Farms, Inc., are collectively referred to herein as "Cavendish Farms."

### 5. Circana

70.     Defendant Circana, LLC is a Delaware limited liability company with its principal place of business in Chicago, Illinois.

71.     Circana was created after the August 2022 merger of two data analytics firms, Information Resources, Inc. (or "IRI") and The NPD Group.[2] It "is the leading advisor on the complexity of consumer behavior. Through unparalleled technology, advanced analytics, cross-

---

[2] https://www.circana.com/intelligence/press-releases/2023/news-press-releases-iri-and-npd-rebrand-as-circana/.

industry data and a deep expertise, Circana provides clarity that helps clients take action and unlock business growth."[3]

72.     Circana's predecessor, The NPD Group, designs, maintains, and/or is otherwise affiliated with the industry services PotatoTrack and SupplyTrack. The PotatoTrack service generally focuses on the foodservice distribution channel for Frozen Potato Products. PotatoTrack enables competitors in the Frozen Potato Product Market, including the Defendant Processors, to directly exchange data to control supply, costs, and downstream pricing. Specifically, PotatoTrack allows Defendant Processors to collect and standardize data, which in turn allows them to monitor or discipline co-conspirators. PotatoTrack's detailed reports provide competitors with a view of the entire market, removing questions of competition on price. Beyond the pricing reports themselves, PotatoTrack allows processors to understand the market using colorful graphs and other helpful graphics to highlight price directions. SupplyTrack is a related service that offers subscribers, including Defendant Processors, market share and volume data.

73.     Another of Circana's predecessors, IRI, provides a similar industry service for the retail distribution channel for Frozen Potato Products. IRI contains retail prices for Frozen Potato Products, along with the SKU ("stock keeping unit"), retailer name, and sales volume data for those products. Using this data, Defendant Processors can calculate one another's market share, offering yet another means of monitoring their co-conspirators' compliance with the conspiracy alleged herein. Defendant Processors could also use the data provided by IRI to determine whether there were opportunities for a given Frozen Potato Product—that is, situations in which items were priced too low relative to the market.

---

[3] *Id.*

**6.     NPPB**

74.     Defendant National Potato Promotion Board d/b/a Potatoes USA is a business entity with its principal place of business located at 3675 Wynkoop Street in Denver, Colorado.

75.     NPPB is a trade association. The four Defendant Processors—again, Lamb Weston, McCain Foods, JRS and Cavendish Farms—are members of NPPB. Other potato growers and importers are also NPPB members.

76.     NPPB holds multiple meetings per year, including an Annual Meeting and a Summer Meeting, which provides additional opportunities for collusion between Defendant Processors, including the executives and senior managers who set and adjust their prices for Frozen Potato Products.

77.     NPPB's mission is "to strengthen the demand for potatoes."[4] Like Defendant Processors, NPPB uses Circana's data to provide information that encourage the industry to adjust pricing and take other actions. NPPB does this by combining Circana pricing data with press releases to show sales trends. For example, on June 6, 2023, an NPPB press release reported that "[p]otato retail sales increased 16% in sales but decreased in volume by -4.4% from January – March 2023 [...] [a]ll categories of potatoes increased in dollar sales, with the most significant occurring for frozen potatoes by 41.9%."[5] Regular press releases like this one, and access to Circana's data, help Defendant Processors know which direction and how much to move pricing.

## IV.     AGENTS AND CO-CONSPIRATORS

78.     The unlawful and anticompetitive acts that this Complaint alleges Defendants undertook were authorized, ordered, or performed by Defendants' agents, officers, employees, or

---

[4] https://potatoesusa.com/about/what-we-do/.

[5] https://potatoesusa.com/news-events/retail-potato-sales-show-consumers-spent-more-on-spuds-in-q1-2023/.

representatives, while managing, directing, or controlling Defendants' affairs or businesses. Defendants are also liable for acts done in furtherance of the alleged conspiracy by companies they acquired through mergers or acquisitions.

79.     Each Defendant's agents operated under the authority and apparent authority of its respective principals.

80.     Each Defendant, through its respective affiliates, agents, and subsidiaries, operated as a single unified entity.

81.     Other persons or entities not named as Defendants here may have participated as co-conspirators in the violations alleged in this Complaint. These other persons and entities may also have performed acts and made statements in furtherance of these alleged violations.

82.     Each Defendant was the principal or agent of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

83.     References to a corporate family or companies by a single name in conspiracy allegations constitute allegations that one or more employees or agents of entities within the corporate family undertook conspiratorial acts or meetings on behalf of all the Defendant companies within that family. Because Defendants market themselves as corporate families, individual participants in the conspiratorial acts did not always know their counterparts' corporate affiliations, nor did they recognize distinctions between entities within a corporate family. Thus, all Defendant entities within the corporate families were knowing and active participants in the conspiracy to maintain supra-competitive prices of Frozen Potato Products.

## V.     FACTUAL ALLEGATIONS

### A.     The Frozen Potato Products Market.

84.     The United States is one of the largest producers of potatoes in the world, producing 44 billion pounds of potatoes in 2023 alone. Most of these potatoes are sold in bulk to Defendant

Processors, who in turn use the majority of their purchased potatoes to make Frozen Potato Products. Roughly 40 percent of the potatoes produced in the United States are ultimately used in Frozen Potato Products—17.6 billion pounds of the 44 billion pounds produced in 2023.

85.     The market for Frozen Potato Products was approximately $68 billion in 2023, and some estimates suggest that number will rise to $92.6 billion by 2030. Frozen french fries provide the largest part of the Frozen Potato Products market. The market for frozen french fries was estimated at $14.84 billion in 2023; by 2030, that number could reach $20 billion annually. Along with french fries, the Frozen Potato Products market includes hash browns, tater tots, and potatoes that are frozen and shaped in other formats. The average American consumer, according to one estimate, consumes nearly 48 pounds of Frozen Potato Products each year.

86.     Defendant Processors convert raw potatoes into Frozen Potato Products through a multi-step process involving specialized machinery. The first step involves washing and peeling the potatoes, a process that often involves a brush roller washing and peeling machine. The potatoes are then trimmed and smoothed before cutting. After the potatoes are cut, subsequent steps include grading, blanching, dewatering, and freezing. When the process is complete, the resulting products are bagged and prepared for distribution.

87.     Defendant Processors sell Frozen Potato Products through two primary distribution streams. Buyers include the foodservice industry—such as hotels, restaurants, schools, and hospitals—and retail buyers like grocery stores and convenience stores. Food distributors may purchase Frozen Potato Products from potato processors and resell those products. This case is brought by Plaintiffs who purchased Frozen Potato Products for personal consumption, primarily from grocery stores and other retailers.

**B.      Defendants Repeatedly Coordinated Nearly Identical Price Hikes of Frozen Potato Products During the Class Period.**

88.     Frozen Potato Products from different manufacturers do not differ significantly in appearance, quality, or use. As a result, Frozen Potato Products are functionally interchangeable commodity products, and large purchasers (like distributors or retailers) often purchase Frozen Potato Products from more than one Defendant Processor. Given these market realities, price represents the primary means of competition. In a competitive market, leading competing manufacturers would try to take customers from one another by offering lower prices—particularly when production costs fall. Yet in the market for Frozen Potato Products, the opposite occurred: Several producers with near-total market control coordinated nearly identical price hikes for several years, resulting in unprecedented profit margins despite significantly declining input costs.

**1.      A Select Group of Defendant Processors' Senior Executives Set Prices for Frozen Potato Products Across Foodservice and Retail.**

89.     Defendant Processors' senior executives set prices for Frozen Potato Products for both their foodservice and retail divisions.  At J.R. Simplot, for example, the same executive was intimately involved in setting prices for both divisions, participating in meetings with customers and approving any price changes in either retail or foodservice.  As a result, multiple J.R. Simplot witnesses noted that they could not recall a situation in which both foodservice or retail wouldn't be affected by a price increase.  Similarly, a McCain witness confirmed that price increases were typically made across the board in both retail and foodservice.

90.     A small number of individuals held responsibility for setting these prices. While J.R. Simplot invested pricing authority in a single individual, Lamb Weston's entire retail division had a team of three individuals setting prices for Frozen Potato Products.

91.     These individuals, moreover, were heavily incentivized to increase prices. Certain Defendant Processors tied executive compensation, including bonuses, to the company's earnings

and profitability. As a result, when Defendant Processors' revenue increased, so did their executives' compensation—which is exactly what happened as Defendants' conspiracy secured record profit margins for the industry. Indeed, Lamb Weston's employees received unprecedented bonuses in 2022 and 2023 as Defendants' coordinated price hikes took effect.

     **2.**      **Prices for Frozen Potato Products Rose Dramatically Because of Defendants' Collusion.**

92.     Defendants conspired to fix the price of Frozen Potato Products throughout the Class Period. Defendants orchestrated this conspiracy at least in part through a detailed exchange of competitively sensitive information, which allowed Defendants to make near-concurrent and near-identical price increases without fear of losing market share to price competition. Because Defendant Processors collectively control nearly 98% of the Frozen Potato Products market, their price impact changes essentially dictate industry-wide prices.

93.     Price increase letters issued by Defendant Processors noted the number of price increases and the effective date of those increases. For example, in January 2021, J.R. Simplot and McCain increased the price of Frozen Potato Products by 4 cents per pound through a price increase letter.

94.     These price-increase letters enabled Defendant Processors to coordinate on prices. When one long-time industry employee suggested that her employer change the method in which it distributed these letters to prevent recipients (such as customers) from forwarding them to others, her supervisors refused to make the change, saying "I don't see the value in that." This exchange left the impression that industry executives "wanted competitors to see" their pricing to facilitate price increases across the industry.

95.     Defendant Processors' Frozen Potato Product prices increased in 2021 before skyrocketing in 2022. The prices remain high through at least the end of 2024, which has created

unparalleled margins for Defendants. Stock analysts writing in May 2023, unaware of Defendants' collusion, predicted that Defendant Lamb Weston's "stepped-up margin expansion" would not be "durable longer term"—an acknowledgement that Defendant Processors' margins were unsustainable in a competitive commodity market. Because of the alleged conspiracy, however, this prediction was erroneous.

96.     Instead, prices for Frozen Potato Products remain at or near their record highs. Data from the Federal Reserve Bank of St. Louis show that as of January 1, 2025, Frozen Potato Products prices were at their highest recorded level since 1967. Indeed, that data indicates that when indexed to 1990 prices, Frozen Potato Product prices stood nearly 350% higher on January 1, 2025, than they were in 1990.



97.     Much of that increase has occurred over the last few years, as a direct result of Defendants' conspiracy. Between 2022 and 2024, for example, the Federal Reserve Bank of St. Louis's data indicates Frozen Potato Product prices increased by roughly 66%. In the decade prior to the conspiracy, in contrast, prices for Frozen Potato Products rose only modestly:



98.     These increases coincided with dramatic decreases in Defendant Processors' costs, as demonstrated by the following graph. This data, also taken from the Federal Reserve Bank of St. Louis, compares the price of Frozen Potato Products (the blue line) with the price of raw potatoes (the purple line). Raw potatoes account for roughly 65% of the cost of making Frozen Potato Products. But even as the price of raw potatoes dropped dramatically in the fall of 2022 and again in 2023, the price of Frozen Potato Products continued to rise. As seen below, Frozen Potato Product prices have remained at all-time highs, even as raw potato prices are near historic lows.



99.    Defendants have, in short, collusively raised and fixed their product prices, including after their input costs declined.

### 3.    Defendants' Exchange of Competitively Sensitive Data and Close-Knit Relationships Enabled Price Coordination.

100.    As detailed below, Defendant Processors had multiple means through which to orchestrate their unlawful conspiracy. Defendants accomplished their conspiratorial aims, in part, by exchanging detailed and competitively sensitive information through third parties (including Defendant Circana) and trade associations (including Defendant NPPB).

*PotatoTrack*.

101.    All Defendant Processors participate in PotatoTrack. As detailed above, PotatoTrack is an industry service run through NPD Group, now known as Circana. Circana is a corporation which provides market information, tracking, analytic, and advisory services to help clients in making better business decisions. Defendants provide their company-specific data to NPD Group, which then sends the Defendant Processors detailed reports based this information. PotatoTrack's only commercial clients are the four Defendant Processors.

102.    From 2008 through the present day, Circana has collected and continues to collect proprietary pricing data on all potato products sent from manufacturers to food service outlets—including restaurants, schools, and hospitals. Unlike "retail scanner data," PotatoTrack data is "instead gathered via a survey of food service suppliers."[6] One report described PotatoTrack as "a cooperative, wholesale and foodservice measurement service providing [individual item] level data for all frozen potato shipments from the four major frozen potato processors—Cavendish,

---

[6] http://dairyprogramhearing.com/getfile65226522.pdf?dDocName=STELPRDC5088455.

- 24 -

[Lamb Weston], McCain and [JRS]—to all U.S. foodservice customers, as well as foodservice exports from the U.S. to foreign countries."[7]

103.    The foodservice data included in PotatoTrack was updated every three to four weeks. Defendant Processors could customize the "dashboard" through which they viewed this data, and they could request customized reports. The data included in a customer's dashboard included market volume and price data broken down by product category (e.g., french fries). PotatoTrack further allowed Defendant Processors to track market share. As a result, a Defendant Processor with access to PotatoTrack had access to each of their competitor's data.

104.    The granularity of this data enabled Defendant Processors to determine if their prices were above or below the aggregate price per pound in a given product category. As one of the Defendant Processors' former longtime employees put it, a processor might think, "Hey I'm up 10%" in a particular product, "but PotatoTrack showed the market was up 100%. We didn't have that" data prior to PotatoTrack. PotatoTrack also enabled Defendant Processors to "slice and dice" this data by geographic region.

105.    On information and belief, PotatoTrack also includes company projections. The Defendants willingly share their commercial data and information with Circana, knowing that the only other commercial industry participants are their competitors in the Frozen Potato Products market. Exchanging and monitoring each other's "share" information disincentivizes Defendants from competing on price to increase market share. Instead, Defendants can, through their conspiracy, maintain artificially high prices for Frozen Potato Products.

---

[7] https://www.potatogrower.com/2009/02/potatotrac-reports-give-marketing-data.

***SupplyTrack***.

106. Defendant Processors also used SupplyTrack, a separate product offered by Circana, to exchange competitively sensitive data. SupplyTrack is a newer service provided by Circana that offers subscribers market and volume data for Frozen Potato Products. SupplyTrack's data allowed subscribers to determine whether their market share for a given product had increased or decreased, even by a single percentage point.

107. Supply Track also provided detailed pricing data, down to the SKU, on Frozen Potato Products in the foodservice distribution channel. This data allowed Defendant Processors to determine the prices distributors were charging customers, even for their competitors' products. This meant that Defendant Processors could use SupplyTrack to determine, down the penny, how much more or less their products were being sold for as compared to their competitors. As such, SupplyTrack gave Defendant Processors specific insights into their competitors' pricing behavior.

***IRI.***

108. Defendants also relied on IRI to gain insights into one another's retail pricing and strategy. IRI provided detailed and competitively sensitive information, like retail prices, SKUs, seller (or retailer) identity, and sales volume data for Frozen Potato Products. IRI's data was sufficiently granular that Defendant Processors could calculate one another's market share using the information provided by IRI.

109. At least some Defendant Processors used the data provided by IRI in meetings with retailers. During these meetings, Defendant Processors used IRI's data to identify opportunities for retailers to increase prices on a SKU supplied by that Defendant Processor. If IRI data showed that a retailer had low pricing on a product, the Defendant Processor would then ask the retailer to increase it.

***National Potato Promotion Board.***

110.     In addition to these information exchanges, the National Potato Promotion Board allows Defendant Processors to efficiently communicate with each other to carry out their conspiratorial objectives.

111.     NPPB disseminates joint marketing, provides export sales updates and, critically, facilitates the exchange of data between the Defendant Processors.

112.     NPPB's quarterly reports provide access to PotatoTrack data.  This data, in turn, allows Defendants to coordinate lockstep movement of prices to supra-competitive levels.

113.     In addition, the NPPB imposes two types of assessments on its members. First, each potato producer pays an assessment on the quantity of potatoes that it produces. Second, the NPPB imposes a $0.03 per hundredweight assessment for potatoes imported into the United States.

114.     Both assessments are significant, and each furthers the conspiracy. The first assessment, based on the amount of potatoes produced, requires each Defendant Processor to buy into the conspiracy to keep its facilitator (NPPB) financially afloat. The second assessment penalizes imports, which financially deters increased supply (and commensurate price decreases) in the Frozen Potato Market.

115.     NPPB also hosts conferences and other meetings for industry insiders that further enable collusion between Defendants, including an Annual Meeting of its membership. These meetings include a conference specifically for potato processors (including Defendant Processors), known as the "Processor Meeting."

**4.      Defendants Imposed Lockstep Price Increases.**

116.     Frozen Potato Products price hikes in 2021 and 2022 were the result of Defendant Processors' imposition of matching simultaneous, or near-simultaneous, price increases on customers. This unprecedented pattern stood out to industry insiders. One such witness explained

that these increases were not "typical," and that this pattern of increases marked a departure from how price increases "historically" occurred in the industry. "It was very suspect," he added.

117.    Acting in concert, the four Defendant Processors—controlling nearly 98% of the Frozen Potato Products market—have extraordinary market power. That market power allows Defendant Processors to control pricing to a remarkable degree. As one former employee of a Defendant Processor put it, due to this market power, even if customers were extremely unhappy with price increases, there was nothing they could do, because they could not get potatoes elsewhere. If these Defendants collectively raise their prices, that increase drives a corresponding increase in the market price.

118.    If each Defendant acted individually, raising and maintaining Frozen Potato Products prices would risk competitors undercutting prices to gain market share. Competition would not permit one Defendant Processor to elevate its prices to extreme levels; competitors would swoop in, undercut that price, and take market share. This is especially true in a market, like this one, where major purchasers (such as large distributors or retailers) often have relationships with multiple suppliers, decreasing the cost and difficulty of switching from a more expensive supplier to a cheaper one. As one industry observer explained, the baseline expectation (in a competitive industry) is that, if one manufacturer charged more than its competitors, customers would not purchase from that manufacturer. That is why third-party analysts erroneously predicted that Lamb Weston's unprecedented margins would not be durable over the longer term. In other words, Defendant Processors' price increases are flatly inconsistent with their individual interests in a non-collusive, competitive market.

119.    By colluding, however, Defendants change the incentives and the functioning of the relevant market. The collusive price increases enacted by Defendant Processors demonstrate that Defendants were driven by their collective interests rather than their individual motivations.

120.     This coordination was enabled, in part, by the limited number of individuals involved in setting Defendant Processors' prices for Frozen Potato Products. According to one industry insider, Lamb Weston's retail division included a category team with only three employees that set prices for its entire Frozen Potato Products category, while J.R. Simplot invested pricing authority in a single individual.

121.     Industry insiders readily acknowledged the industry was ripe for collusion. One witness with decades of experience admitted that there was "definitely some appearance that it's not on the up and up." As he explained, "costs have come down. Pricing hasn't. Now there is excess capacity. Prices should be coming down."

122.     Defendant Processors were so closely connected with one another that, according to one former McCain employee, McCain not only knew the capacity of other Defendant Processors but knew another Defendant Processor's cost per unit for Frozen Potato Products.

123.     On information and belief, before the conspiracy, Defendants' price adjustments focused on their individual company's profits.  That changed, however, in January 2021.

124.     In January 2021, J.R. Simplot and McCain each sent price increase letters to their customers within one day of each other. The letters stated that the cost of Frozen Potatoes would increase by $0.04 per pound. The letters shared an identical effective date of March 15, 2021.

125.     In February 2021, McCain announced a price increase. J.R. Simplot and Cavendish Farms quickly followed suit and announced price increases. Although Lamb Weston did not formally announce a price increase that month, it increased prices—albeit quietly—in that same timeframe.

126.     J.R. Simplot's Sales Director recognized that Simplot once considered pricing annually, but then started to increase prices more often. Indeed, during this period, Defendants began a series of coordinated, regular, and seriatim price increases.

127.    In May 2021, Lamb Weston and McCain sent price increase letters within two weeks of each other. Lamb Weston's letter stated that the price of Frozen Potato Products would increase by $0.08 per pound; the McCain letter stated that the price of Frozen Potato Products would increase by $0.04 per pound. The Lamb Weston and McCain letters had effective dates of July 1, 2021, and July 15, 2021, respectively. Then, on June 4, 2021, Cavendish sent price increase letters indicating that the price for Frozen Potatoes would increase by $0.04 per pound. That letter had an effective date of July 15, 2021—the same effective date as McCain's increase.

128.    In September 2021, when discussing a coming Lamb Weston price hike, Lamb Weston's former Vice-President predicted that McCain—ostensibly a competitor—would welcome and mirror the increase, saying it will probably be exactly the price increase that McCain wanted.

129.    In a span of five days in October 2021, Lamb Weston, McCain, and Cavendish each sent price increase letters. The letters all indicated that the cost of Frozen Potatoes would increase by $0.08 per pound.  Each letter also had the same effective date of December 15, 2021.

130.    In February of 2022, again in a span of just five days, each Defendant Processor sent price increase letters. The letters had the same effective date: April 1, 2022.

131.     Lamb Weston stated on February 11, 2022, that it would raise prices as of April 2022.  Specifically, it announced increased prices on "battered and coated" products by 12 cents per pound and of 10 cents per pound on non-battered products.

132.    On February 15, 2022—just four days later—J.R. Simplot announced identical increases on the same two types of products.  The same day, McCain announced a $0.12 per pound price hike on all its frozen potato products.

133.    The next day, on February 16, 2022, Cavendish Farms announced a price increase of 12 cents per pound for battered and coated frozen potatoes, "formed items," and non-battered frozen potatoes.

134.    Shortly thereafter, on April 8, 2022, Cavendish sent a letter outlining that the cost of Frozen Potatoes would increase by $0.07 per pound. That increase was effective on May 15, 2022.

135.    On April 19, 2022, the owner of Washington, D.C. restaurant Ivey and Coney posted on X (formerly Twitter) that the restaurant had been informed by the Defendants of uniform price increases effective on April 4, 2022. The post stated: "Amazing how all of the major suppliers for French Fries and the like are all raising their prices at the same time and by the same amount." Incredulous, the post added: "Totally not collusion or anything, right?"

136.    Defendants' price hikes for their Frozen Potato Products were remarkably similar, as can be seen in this chart:

| Frozen Potato Product Price Increases, Effective April 4, 2022 | | | | | |
|---|---|---|---|---|---|
| | Potato Products | Coated Potatoes | Roasted / Vegetable Products | Sweet Potato Products | Onion/ Onion Rings |
| Lamb Weston | 0.12 | 0.12 | 0.12 | 0.12 | |
| McCain | 0.12 | 0.12 | 0.12 | 0.12 | 0.23 |
| Cavendish | 0.12 | | 0.15 | | 0.23 |
| Simplot | 0.10 | 0.12 | 0.15 | 0.12 | |

137.    In addition, an industry insider acknowledged these lockstep price hikes, explaining that as of April 2022, multiple Defendant Processors made identical price increases of $0.10 and $0.12. He further explained that after J.R. Simplot initiated a price increase in May 2022, Lamb initiated similar price increases of $.08 and $.10 in July 2022.

138.    On information and belief, in furtherance of the conspiracy, McCain began to ignore its contractual obligations in 2022 and increased all prices to create a 30% margin, regardless of

the contracts' remaining durations. This represents a colossal margin that would not be capturable if a company had to compete on price in a non-collusive market. The price increase, implemented by McCain's upper-level management, could only be enforced because customers had no bargaining power and nowhere else to turn.

139. Indeed, these substantial price increases implemented by McCain and Lamb Weston were only possible because of the pricing solidarity of Cavendish Farms and J.R. Simplot. Absent this coordination between the dominant market participants, an individual company's price increase would have been undercut by the other competitors. Those competitors, in a typical market, would have lowered prices, won sales, and gained market share. Defendants have continued to coordinate their price hikes and have collectively raised and maintained prices at supra-competitive levels.

140. One industry insider observed that she could not think of a time when all four companies did not implement the same price increases when one company issued an increase.

141. In 2023, for example, another senior member of a Defendant Processor acknowledged that Lamb Weston raised prices by 35% and explained that J.R. Simplot, McCain, and Cavendish were similarly continuing to push pricing rather than going after new business. These acts have been to the detriment of Plaintiffs.

142. The margins that Defendants currently enjoy are only possible because of their conspiracy. In 2023, for example, a former industry insider acknowledged that Lamb Weston, J.R. Simplot, and McCain have never seen margins this high in the history of the potato industry. He explained that Defendants "absolutely" have "no incentive to fight that hard for each other's share"; instead, they are all "behaving themselves" to maintain high margins. He remarked that "I think we've done a pretty good job at taking margins with these price increases."

143.     A statement by a former Senior Director at McCain Foods in 2024 similarly reflected his understanding of the benefits provided by price coordination. He explained that McCain did not wish to compete on the price of battered fries with Lamb Weston. Although the former Director noted that he had originally thought McCain should compete and pursue more market share for that product, "the higher ups in the room" had said not to risk it. J.R. Simplot's Director of Sales likewise brushed off customer threats to switch to one of Simplot's competitors after Simplot increased its prices: understanding that competitors' prices were similar, "we knew we weren't worried about it." Defendants trusted their pricing solidarity and knew their co-conspirators would not lower prices to gain market share.

144.     In sum, Defendants' collusive, coordinated price hikes—even as their input costs plummeted—created significant benefits for them and damaged the Plaintiffs. As Lamb Weston's Former VP of International put it, the Defendants had "never ever seen margins this high."

**5.      Defendants Employed Various Methods to Ensure Compliance with the Conspiracy.**

145.     Defendants' conspiracy involved risk, however. Because Defendants were inflating prices above their competitive levels, even as costs in the industry declined, any one Defendant Processor could attempt to capture additional market share by decreasing their prices and/or increasing production.

146.     But Defendants had various means to ensure that no such "cheating" occurred. Services like PotatoTrack, SupplyTrack, and IRI offered Defendants access to granular and competitively sensitive data—including pricing data broken down by product type. This data not only enabled the conspiracy itself by facilitating coordination on pricing, but it offered a means of monitoring each Defendant Processor's compliance with the conspiracy. That data also offered

- 33 -

Defendant Processors insights into one another output levels, yet another means to detect a co-conspirator attempting to undermine the conspiracy.

147. In addition, Defendant Processors tracked each other's production levels in real time. In some instances, Defendant Processors used the same third-party storage vendor. Under the guise of checking on their own wares, personnel from one Defendant Processor had the ability to check on other Defendant Processors' inventory, including the quantity of products, types of products, and even customer destination. Defendant Processors could also capitalize on the proximity of their plants to monitor each other's output. In some areas, where Defendant Processors have plants across the street from one another, employees simply count the number of trucks leaving a given facility as another proxy for production.

148. These various methods of monitoring ensure that no Defendant Processor could capitalize on the obvious economic opportunity created by their collusion and capture additional market share by decreasing their prices or increasing their output.

## C. The Frozen Potato Product Industry Has Features that Make It Susceptible to Collusion.

149. Economists, the United States Department of Justice (DOJ), and the United States Federal Trade Commission (FTC) all recognize that certain economic markets are more susceptible to collusion than others. Generally, it is easier for competitors to collude in markets with any of the following features: (1) high concentration (i.e., the market is dominated by a few large sellers); (2) high barriers to entry; (3) the industry produces a product with low demand elasticity; (4) the industry produces a product with no close substitutes; (5) the industry produces a relatively homogenous commodity product; and (6) the employees of different companies in the industry have established social or professional relationships. These features are present in the Frozen Potato Product industry.

1.      **The Frozen Potato Industry Is Highly Concentrated.**

150.    The market for Frozen Potato Products is highly concentrated, with just four companies producing 97 to 98 percent of Frozen Potato Products: Lamb Weston Holdings controls (40%); McCain Foods Ltd. (30%); J. R. Simplot Co. (20%); and Cavendish Farms (7% to 8%).

151.    The significant degree of concentration in the Frozen Potato Products industry can be measured with the Herfindahl-Hirschman Index, or "HHI." As the DOJ has explained, the HHI is "a commonly accepted measure of market concentration. The HHI is calculated by squaring the market share of each firm competing in the market and then summing the resulting numbers."[8] The HHI "approaches zero when a market is occupied by a large number of firms of relatively equal size and reaches its maximum of 10,000 points when a market is controlled by a single firm."[9] According to the 2023 DOJ/FTC Merger Guidelines, a market is considered highly concentrated if it has an HHI greater than 1,800. The Frozen Potato Products market has an estimated HHI that exceeds 2,900. In other words, the market easily qualifies as highly concentrated.

2.      **Barriers to Market Entry Are High.**

152.    Barriers to entry are obstacles that prevent new companies from forming in a particular industry. Barriers to entry sustain collusion by making it harder for new market participants to open a business that would compete with the colluding firms. There are several barriers to entry in the market for Frozen Potato Products.

---

[8] https://www.justice.gov/atr/herfindahl-hirschman-index#:~:text=The%20term%20%E2%80%9CHHI%E2%80%9D%20means%20the,then%20summing%20the%20resulting%20numbers.

[9] *Id.*

153.    First, opening a new frozen potato processing plant costs hundreds of millions of dollars and can take years to complete. An industry insider estimated that it costs as much as $700 to $800 million to build a processing plant in the United States for french fries alone. In September of 2017, Cavendish announced that it broke ground on a $360 million frozen potato processing plant in Canada.

154.    In addition, any new entrant into the Frozen Potato Product market would need to acquire scarce inputs. For instance, a new Frozen Potato Product company would have to acquire potatoes (ideally at a low cost), but Defendants have already cultivated relationships with the potato growers in low-cost areas of the United States such as Idaho. Indeed, some growers work exclusively with certain Defendant Processors. These potato farmers might be unwilling to gamble on a new business relationship with a new Frozen Potato Product company instead of relying on relationships with Defendants.

**3.    Frozen Potato Products Have Low Demand Elasticity.**

155.    "Demand elasticity" is a measure of how sensitive purchasers are to changes in the price of a product. If a product has high demand elasticity, then an increase in the price of the product will cause a relatively large decrease in the quantity of that product that customers purchase. By contrast, if a product has low demand elasticity (i.e., if the demand for the product is "inelastic") an increase in the price of a product will cause a relatively small decrease in the quantity of the product that customers purchase. When a product has low elasticity of demand, colluding firms can raise prices above competitive levels without losing too many customers for the price hike to be profitable.

156.    Frozen Potato Products have a low demand elasticity. Potato products are enough of a staple in consumers' diets that grocery stores will keep stocking them—and consumers will keep buying them—in the face of price increases. A recent report by Potatoes USA found that "the

demand for potato products is becoming more inelastic. This is a good thing for the US potato industry as inelasticity suggests greater price power, and less volatility of the quantity demanded by consumers to changes in producer costs." Indeed, industry insiders reported that customers continued to purchase Frozen Potato Products even as they expressed displeasure at Defendants' coordinated price hikes.

### 4. Frozen Potato Products Do Not Have Close Substitutes.

157. When a product has no close substitutes, customers are more likely to buy the product at supracompetitive prices (because they have no good alternatives). And when customers are willing to pay supracompetitive prices, the makers of that product will have a stronger incentive to collude, as well as a better chance of sustaining their collusion. Frozen Potato Products have no close substitutes: grocery stores and consumers who want to buy frozen potatoes, hashbrowns, or tater tots generally do not view other frozen vegetables (or any other products) as good alternatives.

### 5. Frozen Potato Products Are Relatively Homogeneous Commodities.

158. When a product is a homogenous commodity, it is easier for firms to collude to raise the price of that product. When all firms in the industry are producing the same products, it is easier for them to agree on prices for those products. It is also easier to tell whether any firms are cheating on a collusive agreement, because each firm in the industry will know that, if a rival deviates from the agreed upon price for a product, the rival is cheating, and not simply offering a different price to account for a difference in the quality or features of the product the rival is producing. The United States Department of Agriculture has determined that Frozen Potato Products are commodities that must satisfy the same specifications.

159. Industry insiders confirmed that Frozen Potato Products are commodity products. As one such individual put it, it is easy for buyers to switch suppliers, and one company is not going to pay more than another for Frozen Potato Products.

**6.      Defendants' Executives Have Social and Business Relationships.**

160.    Collusion opportunities make price-fixing easier. That is because those seeking to engage in collusion can use otherwise legitimate opportunities to discuss prices and production. As a result, regular opportunities for communication among competitors can represent circumstantial evidence of price-fixing. Defendants' executives were unusually close for a set of ostensible competitors. One witness described the industry as a "good ol' boys network," explaining that all the "older men knew each other."

161.    Here, the co-packing arrangements and trade association meetings that are features of the Frozen Potato Products industry provided Defendants with collusion opportunities.

162.    "Co-packing" arrangements are agreements through which a manufacturer outsources part of its production to another company before selling the products made by that other company. When manufactures discuss these arrangements, they also have an opportunity to discuss prices and production quantities with each other.

163.    Lamb Weston has stated that it uses co-packing arrangements, which it calls a common industry practice, to source some of its production to other companies. According to Lamb Weston, there are a limited number of competent, high-quality co-packers in the industry.

164.    In addition, Defendants share membership in multiple industry trade organizations. One such organization, in which all Defendant Processors are members, is the Potato Association of America. The Potato Association of America's "paramount objective" is the "collection and dissemination of the best available technical and practical information relating to all aspects of potato production, biology, and utilization," and it "serves as the official professional society for those involved in potato research, extension, production, and utilization." Each year, the Association hosts a multi-day meeting of industry participants, including Defendants. For example, the Association held its 2022 meeting in July 2022, in Missoula, Montana, its 2023

annual meeting in July 2023 in Charlottetown, Prince Edward Island, and its 2024 meeting in Portland, Oregon. The 2025 meeting is scheduled for July 27 to 31, 2025, in Madison, Wisconsin.

165.     The Defendant Processors are also all members of the National Potato Council. The Council "is the voice of U.S. potato growers and industry members" in Washington D.C. It protects and advances the interests of potato growers in Washington, D.C. It does so "by addressing issues that affect the potato industry, from policy issues debated in Congress to regulatory issues proposed by federal agencies."

166.     The Council held its Potato Expo 2021 from January 5, 2021 to January 7, 2021 as a virtual event. "Each year," as the Council explained, "the Potato Expo brings together growers, suppliers and industry experts to make the largest conference and trade show for the potato industry."

167.     This conference's timing coincided with the price increase letters sent by J.R. Simplot and McCain within one day of each other in January 2021. These letters stated that the cost of Frozen Potatoes would increase by $0.04 per pound. Simplot also stated that the price of line flow potato products would increase by $0.02 per pound. The McCain and Simplot letters each indicated an identical effective date of March 15, 2021.

168.     Additionally, the Defendant Processors have executives on the Potato Sustainability Alliance's board of directors. As of November 4, 2024, Richard Burres (Lamb Weston), Audrey Leduc (McCain Foods), John MacQuarrie (Cavendish Farms), and Jolyn Rasmusen (J.R. Simplot) sit on that board of directors.

169.     Defendant Processors' executives also sit on the board of directors of the American Frozen Food Institute. The Institute's 2024 board of directors includes Tina Almond (McCain), Michelle Damon (J.R. Simplot), Peter D. Johnston (Cavendish Farms), and Jennifer Weekes (Lamb Weston).  That is so even though one former director of a Defendant Processor noted that

being on the same boards as competitors would raise flags for her, because it opens up an opportunity to be in an improper conversation.

170.    The Institute describes its "AFFI-CON" event as the "premier frozen ingredients show that brings together over 500 companies and 1,500+ attendees in a single location, allowing them to meet one-on-one to discuss current and future business opportunities. The average attendee will have 40+ private business meetings that will lay the foundation for their year." The next meeting is scheduled for February 22 to 25, 2025 in Dallas, Texas.

171.    Co-packing arrangements, contact at the above-described industry trade events, and serving together on relevant boards provided Defendants opportunities to meet and conspire about their prices for and production of Frozen Potato Products. Because of these contacts, Defendants' executives knew where their co-conspirators bought and sold their Frozen Potato Products.

**D.    Market Power of Defendant Processors**

172.    The relevant market is the retail market for Frozen Potato Products in the United States.

173.    Frozen Potato Products constitute a distinct product market. Indeed, Potatoes USA tracks the sales of Frozen Potato Products as a distinct category in its retail sales reports. Additionally, FRED data tracks Frozen Potato Products as a standalone commodity.[10]

174.    The relevant geographic market is the United States.

175.    Defendant Processors, who produce well over 90% of products in the Relevant Market, collectively possess market power in that market.

176.    The demand for Frozen Potato Products has low elasticity, and there are no functional substitutes for the product.  The assessment of fees through the NPPB, moreover,

---

[10] *See* HTTPS://FRED.STLOUISFED.ORG/SERIES/WPU024502.

reduces the number of imports that reach the Relevant Market, thereby maintaining the low elasticity of the market.

177. A hypothetical cartel that controlled a large share of the Relevant Market, as Defendant Processors collectively do here, could profitably raise the prices of Frozen Potato Products. Because of the combination of Defendant Processors' market share and consumers' dedication to buying Frozen Potato Products, the gained profits from a small but significant non-transitory price increase for Frozen Potato Products would outweigh any losses from reduced purchases or substitutions by consumers.

178. Nor is this market power merely hypothetical: Defendant Processors' market power has been demonstrated by their ability to dramatically raise prices from 2022 to 2024 without a meaningful reduction in either (a) market share or (b) the overall size of the Relevant Market.

179. Absent the conduct challenged in this Complaint, Defendant Processors would consider each other to be competitors for the sale of Frozen Potato Products in the Relevant Market, given that Defendant Processors sell Frozen Potato Products to the same retail locations throughout the nation. As a result, in a typical market without the anticompetitive conduct detailed above, Defendant Processors would compete with one another on pricing. But as explained above, they have not done so. This further demonstrates the anticompetitive nature through which Defendant Processors have exercised their market power.

## VI.   INTERSTATE TRADE AND COMMERCE

180. Beginning at least as early as January 1, 2021, and continuing through the present, Defendants engaged in a continuing conspiracy or combination in restraint of trade in violation of the Sherman Act. During the Class Period, Defendants sold substantial quantities of Frozen Potato Products in a continuous and uninterrupted flow in interstate commerce to customers located in states other than where Defendants produced their Frozen Potato Products.

181. Defendant's conspiracy had a direct, substantial, intended, and foreseeable impact on interstate commerce in the United States and its territories. Economic studies estimated the Frozen Potato Products market transacted over $65 billion in 2022 and predicted it would grow to over $92 billion by 2030. The Defendants' own facilities in the United States made and sold products in the United States. Further, Defendants knew that their Frozen Potato Products would enter the United States stream of commerce and would affect United States commerce, including harm to Plaintiffs and the proposed classes in the payment of supra-competitive prices for Frozen Potato Products. To the extent any Defendant sold Frozen Potato Products from Canada into the United States, those sales constitute import commerce into the United States, and Defendants' price-fixing had a substantial intended effect on United States import commerce by increasing the prices that buyers paid for Frozen Potato Products.

182. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for Frozen Potato Products in the United States.

183. Defendants' unlawful conduct described herein caused inflated prices for Frozen Potato Products in the United States, and within those States.

184. Defendants' unlawful conduct has a direct and adverse impact on competition in the United States and its territories. Absent Defendants' conspiracy to fix the prices of Frozen Potato Products sold in the United States, the price of Frozen Potato Products would have been determined by a competitive market.

## VII.   ANTITRUST INJURY

185. Defendants' antitrust conspiracy had the following effects, among others:

(a)     Price competition has been restrained or eliminated with respect to the pricing of Frozen Potato Products;

(b)     The prices of Frozen Potato Products have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)     Purchasers of Frozen Potato Products have been deprived of the benefits of free and open competition; and,

(d)     Plaintiffs and other Class members have paid higher and artificially inflated prices for Frozen Potato Products as a direct, foreseeable and proximate result of Defendants' conduct.

186.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and/or maintain the price of Frozen Potato Products.

187.    Defendants' contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

188.    The precise amount of the overcharge impacting the prices of Frozen Potato Products paid by Plaintiffs and the Classes can be measured and quantified using well-accepted models.

189.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the other members of the Classes have sustained injury to their business or property, having paid higher prices for Frozen Potato Products than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy, and, as a result, have suffered damages in an amount presently undetermined. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS

190.    Plaintiffs and other Class members' purchases of Frozen Potato Products within four years prior to the filing of this Complaint are not barred by the applicable four-year statutes of limitations; the statutes are not required to be tolled for these claims to be actionable.

- 43 -

191. Defendants committed, or continued to commit, their antitrust violations within applicable periods of limitation. Defendants increased their prices and caused Plaintiffs and other Class members to pay supra-competitive prices because of those price increases. Because Defendants committed overt acts in furtherance of their conspiracy and their antitrust violation within any applicable period of limitations, Defendants committed a continuing violation of the antitrust laws.

192. In addition, Defendants fraudulently concealed their conspiracy. As described herein, Defendants engaged in affirmative acts that were designed to mislead and conceal their illegal conduct and used pretextual justifications to justify their price increases. Further, price-fixing conspiracies like Defendants' conspiracies are inherently self- concealing.

193. On information and belief, at least Lamb Weston told its managers to communicate about competitor pricing and business intelligence using texting instead of emails to avoid creating emails that could be discovered in the event of an antitrust investigation. Although Lamb Weston managers obtained their competitors' price announcements, the managers were forbidden to email such announcements to C-suite executives so the latter could more plausibly deny receiving information about the announcements.

194. As a result, Plaintiffs did not (and could not) have discovered the existence of the conspiracy through the exercise of due diligence.

195. Accordingly, to the extent that tolling is necessary to advance some or all of the claims alleged by Plaintiffs and the Classes, the four-year statutes of limitations governing claims under the Sherman Act were tolled pursuant to the doctrine of fraudulent concealment.

## IX. DEFENDANTS ARE NOT IMMUNE

196. The Capper-Volstead Act, passed in 1922 as the Co-operative Marketing Associations Act (P.L. 67-146)(7 U.S.C. §§ 291, 292), grants certain agricultural producers an

exemption under the antitrust laws when these producers are acting "in collectively processing, preparing for market, handling, and marketing in interstate and foreign commerce" their agricultural products. Capper-Volstead Act, § 1. These agricultural cooperative "associations and their members may make the necessary contracts and agreements to effect such purposes." Id.

197. The Capper-Volstead Act allows these producers, as part of the cooperative association, to agree on prices and terms of sale, engage in joint marketing activity, agree on common marketing practices with other cooperatives, engage in other combined activities to promote market efficiency, which absent the Act, would run afoul of the Sherman Antitrust Act.

198. Immunity under the Capper-Volstead Act is not absolute; it extends only to organizations or cooperatives whose membership consists exclusively of producers of agricultural products and which are involved in processing, preparing for market, handling or marketing the agricultural products of its members.

199. Further, Capper-Volstead requires that protected cooperatives be "operated for the mutual benefit of the members thereof" and limits the immunity provided by the Act to cooperatives that afford equal corporate suffrage rights to its members, providing "that no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein." The limited protections of the Capper-Volstead Act evaporate unless the organization engaging in the coordinated efforts is exclusively made up of producers. If even one member of a cooperative organization is not a producer, the limited protection of the Capper-Volstead Act will not apply. Even if an individual producer independently qualifies as a Capper-Volstead entity, that individual producer loses Capper-Volstead immunity upon conspiring with a non-Capper-Volstead entity.

200. The plain language of the Capper-Volstead Act affords no immunity for pre-production output restraints: Congress did not grant the cooperatives the power to restrict

supply, only the power to assist producers in marketing the available supply of agricultural products. USDA itself has recognized in various published documents that it is illegal for cooperatives to restrain members' production.

201.    Here, Capper-Volstead flatly does not apply.

202.    Defendants' activities were anticompetitive and predatory. The Defendants' conduct does not include activities that promote market efficiency and have no legitimate business justification. The sole purpose of the conspiracy is to artificially increase the downstream sales price of FPPs in the United States.

203.    Additionally, NPPB consists of members whom are importers, and, therefore, are non-Capper-Volstead protected entities. Further, Defendant Processors each participate in the downstream processing, marketing and transportation of their products, which means that they are not Capper-Volstead protected entities either.

## X.    CLASS ACTION ALLEGATIONS

204.    Plaintiffs bring this action for damages and injunctive relief on behalf of itself and a class of similarly situated persons and entities pursuant to Federal Rules of Civil Procedure, Rule 23(a), (b)(2) and (b)(3), with the class initially defined to include (the "Nationwide Class"):

> All persons or entities that indirectly purchased Frozen Potato Products from one or more Defendants or co-conspirators for personal consumption within the United States from January 1, 2021, until the time that the adverse effects of Defendants' anticompetitive conduct cease (the "Class Period").

205.    Plaintiffs also bring this action on behalf of themselves, and all others similarly situated, as a class action under Federal Rules of Civil Procedure 23(a) and 23(b)(3), seeking damages as well as equitable relief, on behalf of the following class ("the Multi-State Class"):

> All persons or entities that purchased Frozen Potato Products from one or more Defendants or co-conspirators

for personal consumption in Alabama, Arizona, Arkansas, California, Colorado, Connecticut, Washington D.C., Florida, Hawaii, Illinois, Iowa, Kansas, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oregon, Puerto Rico, Rhode Island, South Dakota, Tennessee, Utah, Vermont, West Virginia, and Wisconsin during the Class Period.

206.    The Nationwide Class and the Multi-State Class specifically exclude the following persons or entities: (a) any of the Defendants named herein; (b) any of the corporate Defendants' parent companies, subsidiaries, and affiliates; (c) any of the Defendants' officers, directors, management, employees, subsidiaries, affiliates or agents; (d) all governmental entities; (e) all individuals who make a timely election to be excluded from this proceeding using the correct protocol for opting out; (f) the judges and chambers staff in this case, as well as any members of their immediate families; and (g) all jurors assigned to this case.

207.    Plaintiffs reserve the right to modify or amend the definition of the classes before the Court determines whether certification is appropriate.

208.    **Numerosity (Fed. R. Civ. P. 23(a)(1))**: Plaintiffs do not know the exact number of Class members because such information presently is in the Defendants' exclusive control. But Plaintiffs believe that based on the nature of the trade and commerce involved, there are (at least) many thousands of Class Members dispersed throughout the United Staes and the states identified above, making joinder of all Class Members impracticable.

209.    **Common Questions Predominate, Fed. R. Civ. P. 23(a)(2) and (b)(3)**: Numerous questions of law and fact are common to the Classes related to the existence of the anticompetitive conduct alleged, and the type and common pattern of injury sustained as a result thereof, including:

a.   Whether Defendants engaged in an agreement, combination, or conspiracy to fix, inflate, maintain, or stabilize the prices paid for Frozen Potato Products during the Class Period;

b.   Whether such agreements constituted violations of the Sherman Antitrust Act;

c.   The identity of the participants of the alleged conspiracy;

d.   The duration of the conspiracy alleged herein, and the acts performed by Defendants and their co-conspirators in furtherance of the conspiracy;

e.   Whether Defendants fraudulently concealed their misconduct;

f.   Whether and to what extent Defendants' anticompetitive scheme inflated prices of Frozen Potato Products above competitive levels;

g.   The effect of Defendants' alleged conspiracy on the prices of Frozen Potato Products in the United States and the states identified above during the Class Period;

h.   The nature and scope of injunctive relief necessary to restore competition; and

i.   The measure of damages suffered by Plaintiffs and the Damages Class.

210.   These and other questions of law or fact that are common to the members of the Classes predominate over any questions affecting only individual members of the Classes. Plaintiffs can prove the elements of their claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

211.   **Typicality, Fed. R. Civ. P. 23(a)(3):** Plaintiffs' claims are typical of the claims of other members of the Classes. Plaintiffs' claim arises from the same common course of conduct giving rise to the claims of the Classes, and the relief sought is common to the Classes.

212.   Plaintiffs and the other Class members were injured by the same unlawful conduct, which resulted in their paying more for Frozen Potato Products than they would have in a competitive market.

213.     **Adequacy of Representation, Fed. R. Civ. P. 23(a)(4)**: Plaintiffs will fairly and adequately represent the interests of the Classes because Plaintiffs purchased Frozen Potato Products directly from Defendants within the United States during the Class Period. Plaintiffs have no material conflicts with any other members of the Classes that would be antagonistic to those of the other members of the Classes. Plaintiffs seek no relief that is adverse to the interests of other members of the Classes, and the infringement of rights and damages Plaintiffs sustained are typical of those of other members of the Classes. Furthermore, Plaintiffs have retained sophisticated and competent counsel who are experienced in prosecuting antitrust class actions, as well as other complex litigation. Plaintiffs intend to prosecute this action vigorously.

214.     **Common Grounds for Injunctive Relief, Fed. R. Civ. P. 23(b)(2)**: Defendants have acted on grounds generally applicable to the Classes, thereby making final injunctive relief appropriate with respect to the Classes as a whole.

215.     **Superiority, Fed. R. Civ. P. 23(b)(3):** Class action treatment is a superior method for the fair and efficient adjudication of the controversy in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of effort and expense that numerous individual actions would engender. The relatively small damages suffered by individual members of the Classes compared to the expense and burden of individual prosecution of the claims asserted in this litigation means that, absent a class action, it would not be feasible for members of the Classes to seek redress for the violations of law herein alleged. Further, individual joinder of all damaged members of the Classes is impractical, and the prosecution of separate actions by individual members of the Classes would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants. Accordingly, the benefits of proceeding through the class mechanism, including providing injured persons with a method of

obtaining redress for claims that are not practicable for them to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

216.     This class action is superior to other alternatives for the fair and efficient adjudication of this controversy. Prosecuting the claims pleaded herein as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

## XI.     CLAIMS FOR RELIEF

### COUNT ONE

**VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3**
**RESTRAINT OF TRADE**
**(ON BEHALF OF NATIONWIDE CLASS FOR**
**INJUNCTIVE AND EQUITABLE RELIEF)**

217.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

218.     From at least January 1, 2021 until the effects of their unlawful conduct cease, Defendants entered into and engaged in a contract, combination, conspiracy or agreement to unreasonably restrain trade or commerce in violation of Section 1 and 3 of the Sherman Act (15 U.S.C §§ 1, 3) by artificially restraining competition with respect to the price of Frozen Potato Products sold within the United States.

219.     The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize, or maintain at artificially high levels the prices they charged for Frozen Potato Products in the United States.

220.     In formulating and effectuating this conspiracy, Defendants and their co-conspirators did those things that they combined and conspired to do, including:

      (a)      exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of Frozen Potato Products sold in the United States;

      (b)      participating in meetings, conversations, communications, and using mechanisms among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of Frozen Potato Products sold in the United States;

      (c)      participating in meetings, conversations, and other communications among themselves to implement, adhere to, and police the agreements they reached;

      (d)      engaging in conduct designed to raise and stabilize the prices of Frozen Potato Products sold on the spot market and pursuant to contracts.

221.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreement to fix, maintain, raise, or stabilize prices of Frozen Potato Products.

222.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize, and maintain the price of Frozen Potato Products.

223.    Defendants' activities constitute a per se violation of Sections 1 and 3 of the Sherman Act.

224.    Defendants' conspiracy had the following effects, among others: (a) Price competition in the market for Frozen Potato Products has been restrained, suppressed, and/or eliminated; (b) Prices for Frozen Potato Products provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; (c) Plaintiffs and members of the Class who purchased Frozen Potato Products from Defendants and their co-conspirators have been deprived of the benefits of free and open competition; and (d) purchasers of Frozen Potato Products paid artificially inflated prices.

225.    Defendants' production restrictions, price-fixing, and other actions in furtherance of their conspiracy, as Defendants intended, directly, substantially, and foreseeably increased prices that purchasers paid in the United States for Frozen Potato Products produced in or imported into the United States.

226.    Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for Frozen Potato Products purchased from Defendants than they would have paid in the absence of the conspiracy. As a direct and proximate result, Plaintiffs and other members of the Class have suffered damages in an amount to be determined at trial. Paying such collusive overcharges is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

227.    The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

**COUNT TWO**

**VIOLATION OF THE SHERMAN ACT, 15 U.S.C. §§ 1, 3
CONSPIRACY TO EXCHANGE COMPETITIVELY SENSITIVE
INFORMATION (ON BEHALF OF NATIONWIDE CLASS FOR
INJUNCTIVE AND EQUITABLE RELIEF)**

228.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

229.    From at least January 1, 2021 until the effects of their unlawful conduct cease, Defendants and their co-conspirators have engaged in a continuing agreement to regularly exchange detailed, timely, competitively sensitive, and non-public information regarding Frozen Potato Products. This agreement is an unreasonable restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

230. The relevant market is the product market for Frozen Potato Products, and the relevant geographic market is the United States.

231. Defendants' regular information exchanges through PotatoTrack reflected an independent concerted action between horizontal competitors in the Relevant Market. Indeed, each Defendant Processor furnished competitively sensitive information with the understanding it would be reciprocated.

232. Circana (and before it, NPD) enforced this understanding by requiring Defendants to share data in order to receive comparable data. The agreement to regularly exchange price, supply, and production information through PotatoTrack suppressed competition between the Defendants and could not have been done without the assistance of Circana.

233. The strategic information obtained through PotatoTrack was a material factor in the decisions to inflate prices for Frozen Potato Products during the Class Period.

234. Defendants' unlawful agreements to exchange this data was not reasonably necessary to further any procompetitive purpose.

235. The information exchange has had the effect of (1) reducing and suppressing competition among Defendants in the market for Frozen Potato Products and (2) inflating the price of Frozen Potato Products during the Class Period. As a result of this conduct, Plaintiff and Class members have been injured in their business or property by paying artificially inflated prices for Frozen Potato Products during the Class Period.

236. For this conduct, Plaintiffs and members of the Class are entitled to an injunction against Defendants preventing and restraining the violations alleged herein.

## **VIOLATIONS OF STATE LAW**

237. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

238.     The following Counts Three through Thirty-Four are pleaded under the laws of each State or jurisdiction indicated below, on behalf of the Multi-State Class.

## COUNT THREE

### VIOLATION OF ALABAMA'S ANTITRUST ACT, ALA. CODE §§ 6-5-60, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ALABAMA)

239.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

240.     In violation of Ala. Code. §§ 6-5-60 *et. seq.*, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for Frozen Potato Products.

241.     Defendants' violations of Alabama law were flagrant and willful.

242.     The Class has been injured in its business or property in Alabama by Defendants' violations of Ala. Code. §§ 6-5-60 *et. seq*.

## COUNT FOUR

### VIOLATION OF THE ARIZONA UNIFORM STATE ANTITRUST ACT, ARIZ. REV. STAT. §§ 44-1401, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ARIZONA)

243.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

244.     In violation of Ariz. Rev. Stat. § 44-1402, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for Frozen Potato Products.

245.     Defendants' violations of Arizona law were flagrant and willful.

246.     The Class has been injured in its business or property in Arizona by Defendants' violations of Ariz. Rev. Stat. § 44-1402.

## COUNT FIVE

### VIOLATION OF ARKANSAS DECEPTIVE TRADE PRACTICES ACT,
### ARK. CODE ANN. §§ 4-88-101, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ARKANSAS)

247.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

248.    In violation of Ark. Code Ann. §§ 4-88-101 *et. seq.*, Defendants' price-fixing agreements unreasonably restrain trade in the relevant market for Frozen Potato Products and mislead consumers into believing the price of Frozen Potato Products was the result of a competitive and free market.

249.    Defendants' violations of Arkansas law were substantively unconscionable because Defendants' price-fixing agreements benefitted Defendants at the expense of Plaintiffs and Class Members.

250.    The Class has been injured in its business or property in Arkansas by Defendants' violations of Ark. Code Ann. §§ 4-88-101 *et. seq*.

## COUNT SIX

### VIOLATION OF CALIFORNIA'S CARTWRIGHT ACT,
### CAL. BUS. & PROF. CODE § 16700, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CALIFORNIA)

251.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

252.    Defendants entered into unlawful price-fixing agreements that are illegal "trusts," within the meaning of Cal. Bus. & Prof. Code § 16720. These agreements constitute unreasonable restraints of trade and "combination[s] of capital, skill or acts by two or more persons" in order to: "create or carry out restrictions in trade or commerce" (§16720(a)); "prevent competition in [the]

sale or purchase of merchandise" (§ 16720(c)); and "fix [a] standard or figure, whereby [the] price" of Frozen Potato Products "shall be…controlled or established" (§16720(d)).

253.    Defendants' violations of California law were flagrant and willful.

254.    The Class has been injured in its business or property in California by Defendants' violations of Cal. Bus. & Prof. Code § 16720.

**COUNT SEVEN**

**VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW,
CAL. BUS. & PROF. CODE § 17200, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CALIFORNIA)**

255.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

256.    Defendants' conduct described above constitutes unfair, unlawful, or fraudulent business acts or practices as proscribed by California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200, et seq. (the "UCL").

257.    Defendants' conduct is unethical, unscrupulous, against public policy, and violates fundamental rules of honesty and fair dealing.

258.    Defendants' conduct is unfair because it violates Section 2 of the Sherman Act, and the strong California public policy against monopoly.

259.    Defendants' conduct is unlawful, as it violates the spirit and letter of Section 2 of the Sherman Act, and California's common law prohibition on monopolies.

260.    Plaintiffs and members of the Class lost money because they paid inflated prices for Frozen Potato Products, and seek the full extent of restitution available under the UCL.

**COUNT EIGHT**

**VIOLATION OF COLORADO'S ANTITRUST ACT,
COL. REV. STAT. § 6-4-104, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN COLORADO)**

261. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

262. In violation of Colo. Rev. Stat. § 6-4-104, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

263. Defendants' violations of Colorado law were flagrant and willful.

264. The Class has been injured in its business or property in Colorado by Defendants' violations of Colo. Rev. Stat. § 6-4-104.

**COUNT NINE**

**VIOLATION OF CONNECTICUT'S ANTITRUST ACT,
CONN. GEN. STAT. § 35-24, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN CONNECTICUT)**

265. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

266. In violation of Conn. Gen. Stat. §§ 35-26, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

267. Defendants' violations of Connecticut law were flagrant and willful.

268. The Class has been injured in its business or property in Connecticut by Defendants' violations of Conn. Gen. Stat. §§ 35-26.

## COUNT TEN

### VIOLATION OF THE DISTRICT OF COLUMBIA ANTITRUST ACT, D.C. CODE § 28-4501, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN THE DISTRICT OF COLUMBIA)

269.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

270.     In violation of D.C. Code §§ 28-4502, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

271.     Defendants' violations of District of Columbia law were flagrant and willful.

272.     The Class has been injured in its business or property in the District of Columbia by Defendants' violations of D.C. Code §§ 28-4502.

## COUNT ELEVEN

### VIOLATION OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN FLORIDA)

273.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

274.     In violation of Fla. Stat. § 501.204, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

275.     Defendants' violations of Florida law were flagrant and willful.

276.     The Class has been injured in its business or property in Florida by Defendants' violations of Fla. Stat. § 501.204.

## COUNT TWELVE

### VIOLATION OF THE HAWAII ANTITRUST STATUTE, HAW. REV. STAT. § 480-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN HAWAII)

277. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

278. In violation of Haw. Rev. Stat. § 480-4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

279. Defendants' violations of Hawaii law were flagrant and willful.

280. The Class has been injured in its business or property in Hawaii by Defendants' violations of Haw. Rev. Stat. § 480-4.

## COUNT THIRTEEN

### VIOLATION OF THE ILLINOIS ANTITRUST ACT, 740 ILL. COMP. STAT. 10/1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN ILLINOIS)

281. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

282. In violation of 740 Ill. Comp. Stat. 10/3, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

283. Defendants made contracts with, or engaged in combinations or conspiracies with, other persons who are, or but for a prior agreement would be, a competitor of such person for the purpose or with the effect of fixing, controlling or maintaining the price paid for Frozen Potato Products in Illinois.

284.     Defendants fixed, controlled or maintained the sale or supply of Frozen Potato Products, for the purpose or with the effect of fixing, controlling or maintaining the price of Frozen Potato Products in Illinois.

285.     By contract, combination or conspiracy, Defendants unreasonably restrained trade or commerce for Frozen Potato Products in Illinois.

286.     Defendants' violations of Illinois law were flagrant and willful.

287.     The Class has been injured in its business or property in Illinois by Defendants' violations of 740 Ill. Comp. Stat. 10/3.

## COUNT FOURTEEN

### VIOLATION OF THE IOWA COMPETITION LAW,
### IOWA CODE §§ 553.1, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN IOWA)

288.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

289.     In violation of Iowa Code §§ 553.4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

290.     Defendants' violations of Iowa law were flagrant and willful.

291.     The Class has been injured in its business or property in Iowa by Defendants' violations of Iowa Code §§ 553.4.

## COUNT FIFTEEN

### VIOLATION OF THE KANSAS RESTRAINT OF TRADE ACT,
### KAN. STAT. ANN. §§ 50-101, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN KANSAS)

292.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

293.     In violation of Kan. Stat. Ann. §§ 50-101, *et seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products. Defendants entered into arrangements, contracts, agreements, trust or combinations between others made with a view toward preventing or which tend to prevent full and free competition for the provision of Frozen Potato Products.

294.     Defendants' violations of Kansas law were flagrant and willful.

295.     The Class has been injured in its business or property in Kansas by Defendants' violations of Kan. Stat. Ann. §§ 50-101, *et seq*.

**COUNT SIXTEEN**

**VIOLATION OF MAINE'S MONOPOLIES AND PROFITEERING LAW,
ME. REV. STAT. ANN. TIT. 10, §§ 1101, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MAINE)**

296.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

297.     In violation of Me. Rev. Stat. Ann. tit. 10, § 1101, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

298.     Defendants' violations of Maine law were flagrant and willful.

299.     The Class has been injured in its business or property in Maine by Defendants' violations of Me. Rev. Stat. Ann. tit. 10, § 1101.

**COUNT SEVENTEEN**

**VIOLATION OF THE MARYLAND ANTITRUST ACT,
MD. CODE COM. LAW § 11-204, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MARYLAND)**

300.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

301.     In violation of Md. Code Com. Law § 11-204, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

302.     Defendants' violations of Maryland law were flagrant and willful.

303.     The Class has been injured in its business or property in Maryland by Defendants' violations of Md. Code Com. Law § 11-204.

**COUNT EIGHTEEN**

**VIOLATION OF THE MASSACHUSETTS CONSUMER PROTECTION ACT, MASS. GEN. LAWS. CH. 93A § 1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MASSACHUSETTS)**

304.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

305.     In violation of Mass. Gen. Laws. Ch. 93A § 2, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

306.     Defendants' violations of Massachusetts law were flagrant and willful.

307.     The Class has been injured in its business or property in Massachusetts by Defendants' violations of Mass. Gen. Laws. Ch. 93A § 2.

**COUNT NINETEEN**

**VIOLATION OF THE MICHIGAN ANTITRUST REFORM ACT, MICH. COMP. LAWS ANN. §§ 445.771, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MICHIGAN)**

308.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

309.     In violation of Mich. Comp. Laws Ann. § 445.772, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

310.     Defendants' violations of Michigan law were flagrant and willful.

311.     The Class has been injured in its business or property in Michigan by Defendants' violations of Mich. Comp. Laws Ann. § 445.772.

## COUNT TWENTY

### VIOLATION OF THE MINNESOTA ANTITRUST LAW, MINN. STAT. ANN. §§ 325D.49, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MINNESOTA)

312.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

313.     In violation of Minn. Stat. Ann. § 325D.51, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

314.     Defendants' violations of Minnesota law were flagrant and willful.

315.     The Class has been injured in its business or property in Minnesota by Defendants' violations of Minn. Stat. Ann. § 325D.51.

## COUNT TWENTY-ONE

### VIOLATION OF THE MISSISSIPPI ANTITRUST STATUTE, MISS. CODE ANN. §§ 75-21-3, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MISSISSIPPI)

316.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

317.    In violation of Miss. Code Ann. § 75-21-1, *et. seq.*, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

318.    Defendants' violations of Mississippi law were flagrant and willful.

319.    The Class has been injured in its business or property in Mississippi by Defendants' violations of Miss. Code Ann. § 75-21-1, *et. seq.*

**COUNT TWENTY-TWO**

**VIOLATION OF THE MONTANA CONSUMER PROTECTION ACT,
MONT. CODE ANN. §§ 30-14-101, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN MONTANA)**

320.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

321.    In violation of Mont. Code Ann. §§ 59-801 et seq., Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

322.    Defendants' violations of Montana law were flagrant and willful.

323.    The Class has been injured in its business or property in Montana by Defendants' violations of Mont. Code Ann. §§ 59-801 et seq.

**COUNT TWENTY-THREE**

**VIOLATION OF THE NEBRASKA JUNKIN ACT,
NEB. CODE ANN. §§ 59-801, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEBRASKA)**

324.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

325. In violation of Neb. Code Ann. § 59-801, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

326. Defendants' violations of Nebraska law were flagrant and willful.

327. The Class has been injured in its business or property in Nebraska by Defendants' violations of Neb. Code Ann. § 59-801.

## COUNT TWENTY-FOUR

### VIOLATION OF THE NEVADA UNFAIR TRADE PRACTICES ACT, NEV. REV. STAT. ANN. §§ 598A.010, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEVADA)

328. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

329. In violation of Nev. Rev. Stat. Ann. § 598A.060, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

330. Defendants' violations of Nevada law were flagrant and willful.

331. The Class has been injured in its business or property in Nevada by Defendants' violations of Nev. Rev. Stat. Ann. § 598A.060.

## COUNT TWENTY-FIVE

### VIOLATION OF THE NEW HAMPSHIRE ANTITRUST STATUTE, N.H. REV STAT. ANN. §§ 356.1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW HAMPSHIRE)

332. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

333. In violation of N.H. Rev Stat. Ann. § 356.2, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

334. Defendants' violations of New Hampshire law were flagrant and willful.

335. The Class has been injured in its business or property in New Hampshire by Defendants' violations of N.H. Rev Stat. Ann. § 356.2.

## COUNT TWENTY-SIX

### VIOLATION OF THE NEW JERSEY ANTITRUST ACT, N.J. STAT. ANN. § 56:9-3, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW JERSEY)

336. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

337. In violation of N.J. Stat. Ann. § 56:9-3, *et seq*., Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

338. Defendants' violations of New Jersey law were flagrant and willful.

339. The Class has been injured in its business or property in New Jersey by Defendants' violations of N.J. Stat. Ann. § 56:9-3, *et seq.*

## COUNT TWENTY-SEVEN

### VIOLATION OF THE NEW MEXICO ANTITRUST ACT, N.M. STAT. ANN. §§ 57-1-1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW MEXICO)

340. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

341.    In violation of N.M. Stat. Ann. § 57-1-1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

342.    Defendants' violations of New Mexico law were flagrant and willful.

343.    The Class has been injured in its business or property in New Mexico by Defendants' violations of N.M. Stat. Ann. § 57-1-1.

## COUNT TWENTY-EIGHT

### VIOLATION OF THE NEW YORK DONNELLY ACT,
### N.Y. GEN. BUS. LAW §§ 340, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NEW YORK)

344.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

345.    In violation of N.Y. Gen. Bus. Law § 340, Defendants agreed not to compete. Defendants entered into contracts, agreements, arrangements, or combinations that have unreasonably restrained competition in New York. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products

346.    Defendants' violations of New York law were flagrant and willful.

347.    The Class has been injured in its business or property in New York by Defendants' violations of N.Y. Gen. Bus. Law § 340.

## COUNT TWENTY-NINE

### VIOLATION OF CHAPTER 75 OF NORTH CAROLINA'S GENERAL STATUTES,
### N.C. GEN. STAT. ANN. §§ 75-1, ET SEQ.
### (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH CAROLINA)

348.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

349. In violation of N.C. Gen. Stat. Ann. § 75-1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

350. Defendants' violations of North Carolina law were flagrant and willful.

351. The Class has been injured in its business or property in North Carolina by Defendants' violations of N.C. Gen. Stat. Ann. § 75-1.

## COUNT THIRTY

### VIOLATION OF THE NORTH DAKOTA UNIFORM STATE ANTITRUST ACT, N.D. CENT. CODE §§ 51-08.1-01, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN NORTH DAKOTA)

352. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

353. In violation of N.D. Cent. Code § 51-08.1-02, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

354. Defendants' violations of North Dakota law were flagrant and willful.

355. The Class has been injured in its business or property in North Carolina by Defendants' violations of N.D. Cent. Code § 51-08.1-02.

## COUNT THIRTY-ONE

### VIOLATION OF THE OREGON ANTITRUST ACT, OR. REV. STAT. §§ 646.705, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN OREGON)

356. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

357.    In violation of Or. Rev. Stat. § 646.725, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

358.    Defendants' violations of Oregon law were flagrant and willful.

359.    The Class has been injured in its business or property in Oregon by Defendants' violations of Or. Rev. Stat. § 646.725.

## COUNT THIRTY-TWO

### VIOLATION OF PUERTO RICO ANTIMONOPOLY LAW,<br>P.R. LAWS ANN. TIT. 10, CH. 13, § 257 ET SEQ.<br>(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN PUERTO RICO)

360.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

361.    In violation of P.R. Laws Ann. tit. 10, ch. 13, § 258, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

362.    Defendants' violations of Puerto Rico law were flagrant and willful.

363.    The Class has been injured in its business or property in Puerto Rico by Defendants' violations of P.R. Laws Ann. tit. 10, ch. 13, § 258.

## COUNT THIRTY-THREE

### VIOLATION OF THE RHODE ISLAND ANTITRUST ACT,<br>R.I. GEN. LAWS §§ 6-36-1, ET SEQ.<br>(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN RHODE ISLAND)

364.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

365.     In violation of R.I. Gen. Laws § 6-36-4, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

366.     Defendants' violations of Rhode Island law were flagrant and willful.

367.     The Class has been injured in its business or property in Rhode Island by Defendants' violations of R.I. Gen. Laws § 6-36-4.

## COUNT THIRTY-FOUR

### VIOLATION OF THE SOUTH DAKOTA ANTITRUST STATUTE, S.D. CODIFIED LAWS §§ 37-1-3.1, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN SOUTH DAKOTA)

368.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

369.     In violation of S.D. Codified Laws §§ 37-1-3.1, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

370.     Defendants' violations of South Dakota law were flagrant and willful.

371.     The Class has been injured in its business or property in South Dakota by Defendants' violations of S.D. Codified Laws §§ 37-1-3.1.

## COUNT THIRTY-FIVE

### VIOLATION OF TENNESSEE'S TRADE PRACTICES ACT, TENN. CODE ANN. §§ 47-25-101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN TENNESSEE)

372.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

373. In violation of Tenn. Code Ann. § 47-25-101, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

374. Defendants' violations of Tennessee law were flagrant and willful.

375. The Class has been injured in its business or property in Tennessee by Defendants' violations of Tenn. Code Ann. § 47-25-101.

## COUNT THIRTY-SIX

### VIOLATION OF THE UTAH ANTITRUST ACT, UTAH CODE ANN. §§ 76-10-3101, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN UTAH)

376. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

377. In violation of Utah Code Ann. § 76-10-3104, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

378. Defendants' violations of Utah law were flagrant and willful.

379. The Class has been injured in its business or property in Utah by Defendants' violations of Utah Code Ann. § 76-10-3104.

## COUNT THIRTY-SEVEN

### VIOLATION OF THE VERMONT CONSUMER FRAUD ACT, VT. STAT. ANN. TIT. 9, §§ 2451, ET SEQ. (WITH RESPECT TO CLASS MEMBERS' PURCHASES IN VERMONT)

380. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

381.     In violation of Vt. Stat. Ann. tit. 9, §§ 2453, 2465, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

382.     Defendants' violations of Vermont law were flagrant and willful.

383.     The Class has been injured in its business or property in Vermont by Defendants' violations of Vt. Stat. Ann. tit. 9, §§ 2453, 2465.

**COUNT THIRTY-EIGHT**

**VIOLATION OF THE WEST VIRGINIA ANTITRUST ACT,
W.VA. CODE §§ 47-18-1, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN WEST VIRGINIA)**

384.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

385.     In violation of W.Va. Code § 47-18-3, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

386.     Defendants' violations of West Virginia law were flagrant and willful.

387.     The Class has been injured in its business or property in Vermont by Defendants' violations of W.Va. Code § 47-18-3.

**COUNT THIRTY-NINE**

**VIOLATION OF THE WISCONSIN ANTITRUST ACT,
WIS. STAT. §§ 133.01, ET SEQ.
(WITH RESPECT TO CLASS MEMBERS' PURCHASES IN WISCONSIN)**

388.     Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

389.    In violation of Wis. Stat. § 133.03, Defendants agreed not to compete. These price-fixing agreements unreasonably restrain competition in the relevant market for Frozen Potato Products.

390.    Defendants' violations of Wisconsin law were flagrant and willful.

391.    The Class has been injured in its business or property in Vermont by Defendants' violations of Wis. Stat. § 133.03.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs requests that the Court enter judgment on its behalf and on behalf of the Classes, by adjudging and decreeing as follows:

A.    Determining that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure,

B.    Appointing Plaintiffs as representatives of the Classes and the undersigned law firms as Class Counsel, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Classes;

C.    Adjudging and decreeing that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been a *per se* violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3), and a violation of each of the state laws alleged herein;

D.    Awarding compensatory damages for Defendants' violations under the state laws alleged herein, including multiple damages according to law against Defendants, jointly and severally, in an amount to be proven at trial;

E.    Awarding punitive, exemplary, statutory, and full consideration damages under the state laws alleged herein;

- 73 -

F.      Ordering the disgorgement of Defendants' profits that resulted from their wrongful and unlawful conduct, and ordering Defendants to pay restitution for the same;

G.      Entering judgment against Defendants, jointly and severally, and in favor of Plaintiffs and members of the Classes for treble the amount of damages sustained by Plaintiffs and the Classes as allowed by law, together with costs of the action, including reasonable attorneys' fees, pre- and post-judgment interest at the highest legal rate from and after the date of service of this Complaint to the extent provided by law;

H.      Awarding pre- and post-judgment interest as provided by law;

I.      Awarding costs of suit, including reasonable attorneys' fees;

J.      Permanently enjoining and restraining Defendants, their affiliates, successors, transferees, assignees, and other offices, directors, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other contract, conspiracy, or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

K.      Permanently enjoining each of the Defendants, and their respective successors, assigns, parent, subsidiaries, affiliates, and transferees, and their officers, directors, agents, and representatives, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, restraining them against, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding, or concert of action as alleged herein; and

L.      Awarding Plaintiffs and members of the Classes such other and further relief as the case may require and the Court may deem just and proper under the circumstances.

- 74 -

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all claims asserted in this Complaint that are so triable.

DATED: February 24, 2025

Respectfully submitted,

/s/ *Steve W. Berman*
STEVE W. BERMAN (ARDC 3126833)
Breanna Van Engelen (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tel: (206) 623-7292
steve@hbsslaw.com
breannav@hbsslaw.com

/s/ *Shana E. Scarlett*
SHANA E. SCARLETT (*pro hac vice forthcoming*)
Rio S. Pierce (*pro hac vice forthcoming*)
John M. Grant (*pro hac vice forthcoming*)
715 Hearst Avenue, Suite 300
Berkeley, CA 94710
Tel: (510) 725-3000
shanas@hbsslaw.com
riop@hbsslaw.com
john.grant@hbsslaw.com

/s/ *Brent W. Johnson*
BRENT W. JOHNSON (*pro hac vice*)
Alison Deich (*pro hac vice*)
Zachary R. Glubiak (*pro hac vice*)
Alex Bodaken (*pro hac vice*)
COHEN MILSTEIN SELLERS & TOLL, PLLC
1100 New York Ave. NW
Suite 500, West Tower
Washington, DC 20005
Tel: (202) 408-4600
bjohnson@cohenmilstein.com
adeich@cohenmilstein.com
zglubiak@cohenmilstein.com
abodaken@cohenmilstein.com

*Counsel for Plaintiffs and the Proposed Classes*